IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

DESMOND QUICK,

               Plaintiff,           Civil Action No.
                                   9:12-CV-1529 (DNH/DEP)

     v.

JOHN QUINN, *et al.*,

               Defendants.

_____

APPEARANCES:                      OF COUNSEL:

FOR PLAINTIFF:

DESMOND QUICK, *Pro Se*
03-B-1945
Marcy Correctional Facility
P.O. Box 3600
Marcy, NY  13403

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN    RACHEL M. KISH, ESQ.
New York State Attorney General    Assistant Attorney General
The Capitol
Albany, NY 12224


DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

*Pro se* plaintiff Desmond Quick, a New York State prison inmate, has commenced this action pursuant to 42 U.S.C. § 1983, alleging that four corrections officers employed at the facility in which he was confined at the relevant times deprived him of his civil rights. Plaintiff contends that some of the named defendants physically assaulted him, while others either orchestrated the assault or failed to intervene and protect him.

Now that discovery in the action is closed, defendants have moved for partial summary judgment dismissing plaintiff's claims against one of the corrections officers named in plaintiff's complaint, arguing that he was not personally involved in the alleged constitutional deprivations. For the reasons set forth below, I recommend that defendants' motion be granted.

I.   <u>BACKGROUND</u>[1]

Plaintiff is a prison inmate currently being held in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). *See generally* Dkt. No. 1. While he is currently incarcerated elsewhere, at the times relevant to his claims in this action Quick was confined in the Mental Health Unit ("MHU") at the Auburn Correctional

---

[1]    In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

Facility ("Auburn"), located in Auburn, New York. Dkt. No. 1 at 5; Dkt. No. 43 at 1; *see also* Dkt. No. 41-1 at 10.

On April 16, 2012, while confined in an MHU cell at Auburn, plaintiff spread feces over himself and his cell. Dkt. No. 1 at 5; Dkt. No. 41-1 at 10. As a result of plaintiff's actions, a call was placed by defendant John Quinn, a corrections lieutenant and named-defendant, for assistance in connection with the matter. Dkt. No. 1 at 5. According to plaintiff, in response, Corrections Officers Chris Novack, Sean Reilly,[2] and Joseph Baney, all of whom are also named as defendants in Quick's complaint, appeared in full extraction gear, prepared to remove him from his cell. Dkt. No. 1 at 5; Dkt. No. 41-1 at 10-11. Plaintiff alleges that defendants Novack and Reilly restrained him, using handcuffs and a waist chain, and then "dragged" him to the shower. Dkt. No. 1 at 8; Dkt. No. 41-1 at 10. Upon arrival at the shower, defendants Novack and Reilly stripped plaintiff but left him handcuffed behind his back. Dkt. No. 1 at 8. Plaintiff alleges that defendant Novack struck him in the face until he began to bleed and stepped on his right foot, knee, and thigh "numerous times." *Id.* at 9; Dkt. No. 41-1 at 11. Defendant Reilly also allegedly bent plaintiff's right arm

---

[2]     Although plaintiff's complaint and the court's records list this defendant as "C.O. Shawn Riely," it appears from his declaration that his name is correctly spelled as "Sean Reilly." Dkt. No. 41-2. The clerk is respectfully directed to adjust the court's records to reflect the correct the spelling of that defendant's name.

and hand.[3] Dkt. No. 1 at 9. According to plaintiff, although defendant Baney witnessed the incident, he stood by without intervening to protect plaintiff. *Id.*; Dkt. No. 41-1 at 11. Plaintiff alleges he suffered bumps and bruises to the face, forehead, and right thigh, as well as a cut over his right eye. Dkt. No. 1 at 10.

Following the assault, Corrections Officer Frantcezk, who is not named as a defendant, arrived at the shower and began videotaping plaintiff. Dkt. No. 1 at 9; Dkt. No. 41-1 at 11. Plaintiff was then escorted to an MHU interview room, where he was treated for his injuries by a prison nurse.[4] Dkt. No. 1 at 9-10; Dkt. No. 41-1 at 11.

## II. PROCEDURAL HISTORY

Plaintiff commenced this action on October 9, 2012, with the filing of a complaint accompanied by an application to proceed in the action *in forma pauperis* ("IFP"). Dkt. Nos. 1, 2. Named as defendants in plaintiff's complaint are Corrections Lieutenant John Quinn and Corrections Officers Chris Novack, Sean Reilly, and Joseph Baney. Dkt. No. 1 at 1-2. The court granted plaintiff's IFP application on November 21, 2012. Dkt. No. 7.

---

[3]     At his deposition, plaintiff testified that, in addition to bending his right arm and hand, defendant Reilly bit him. Dkt. No. 41-1 at 11.

[4]     As a result of the incident, plaintiff was charged with violating prison rules, including committing an unhygienic act and causing loss/damage to DOCCS property. Dkt. No. 41-1 at 17. Following a disciplinary hearing, plaintiff was found guilty of the charges and sentenced to two months and twenty-three days of confinement in a facility special housing unit. *Id.*

On October 3, 2013, following the joinder of issue and completion of pretrial discovery, defendants filed a motion, seeking the entry of partial summary judgment as against defendant Reilly. Dkt. No. 41. Defendants' motion is based exclusively upon their assertion that there is insufficient record evidence from which a reasonable factfinder could conclude that defendant Reilly was personally involved in the incident on April 16, 2012, as alleged by plaintiff, since he was not working at Auburn on that date. Dkt. No. 41-3 at 5-6. Plaintiff has since responded in opposition to defendants' motion. Dkt. No. 43. The pending motion, which is now fully briefed and ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

III.   DISCUSSION

A.   Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford*

*v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A

fact is "material" for purposes of this inquiry, if it "might affect the outcome

of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also*

*Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing

*Anderson*). A material fact is genuinely in dispute "if the evidence is such

that a reasonable jury could return a verdict for the nonmoving party."

*Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of

demonstrating that there is no genuine dispute of material fact to be

decided with respect to any essential element of the claim in issue, and

the failure to meet this burden warrants denial of the motion. *Anderson*,

477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial

burden is met, the opposing party must show, through affidavits or

otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P.

56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any

ambiguities, and draw all inferences, in a light most favorable to the

nonmoving party. *Tolan*, 134 S. Ct. at 1866; *Jeffreys*, 426 F.3d at 553;

*Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of

summary judgment is justified only in the event of a finding that no

reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

      B.    <u>Personal Involvement</u>

    In their motion, defendants contend that, because defendant Reilly was not working at Auburn on April 16, 2012, there is insufficient record evidence from which a reasonable factfinder could conclude that he was personally involved in the alleged assault of plaintiff at Auburn on that date. Dkt. No. 41-3 at 5-6.

    "Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991); *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977)). As the Supreme Court has noted, a defendant may only be held accountable for his actions under section 1983. *See Iqbal*, 556 U.S. at 683 ("[P]etitioners cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic."). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection

between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). "To be sufficient before the law, a complaint must state precisely who did what and how such behavior is actionable under law." *Hendrickson v. U.S. Attorney Gen.*, No. 91-CV-8135, 1994 WL 23069, at *3 (S.D.N.Y. Jan. 24, 1994).[5]

In support of their motion, defendants have submitted a sworn declaration of defendant Reilly, in which he denies having had contact with plaintiff on April 16, 2012, and states that he was not working at Auburn on that date because it was his regular day off. Dkt. No. 41-2 at 1-2. This assertion is supported by a copy of defendant Reilly's timecard which, though difficult to read, appears to substantiate his statement that he did not work on April 16, 2012. *Id.* at 4.

Defendant Reilly's contention that he did not work on the day in question is contradicted by the allegations in plaintiff's complaint, Dkt. No. 1, which was signed under penalty of perjury and thus carries the force and effect of an affidavit. *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit for summary judgment purposes."). In his opposition to defendants' pending motion, however, plaintiff does not squarely dispute defendant Reilly's assertion

---

[5]     Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

that he was not working at Auburn on April 16, 2012. *See generally* Dkt. No. 43-1. Instead he contends that (1) the timecard submitted by defendant Reilly is not authentic and may have been altered, and (2) defendants failed to produce the MHU sign-in logbook for April 16, 2012, which, according to plaintiff, "cannot be altered" and would show "who entered the facility that day." *Id.* at 6.

With respect to plaintiff's second contention, he maintains that he requested the logbook in his May 21, 2013 discovery demand, but that the documents produced by defendants did not include the logbook. Dkt. No. 43-2 at 1-2. On February 15, 2013, I issued a standard Rule 16 scheduling order in this case requiring the parties to provide certain mandatory disclosures. That order required, *inter alia*, that defendants provide the following documents within their possession, custody, or control concerning plaintiff's excessive force claims:

> Photographs, unusual incident reports, use-of-force reports, disciplinary charges, records (including transcripts) of disciplinary hearings, determinations of disciplinary charges and appeals therefrom, videotapes, audiotapes, and medical records concerning treatment for any injuries allegedly received by the plaintiff as a result of the incident(s) alleged in the complaint.

*Id.* at 6 (footnotes omitted). In a letter dated May 22, 2013, the court was advised by defendants' counsel that defendants had fully complied with

that order. Dkt. No. 25.

On June 25, 2013, the court entertained oral argument concerning two applications by the plaintiff, one requesting an order compelling defendants to produce additional documents, and the second requesting an extension of the deadline for filing a further motion to compel discovery, related to the discovery demands served on May 21, 2013. Dkt. Nos. 28, 29. After noting that plaintiff's requests were untimely under this court's local rules, which require that any discovery demands be served more than thirty days prior to the close of discovery, I nonetheless ordered defendants to respond to the late discovery demands, and specifically directed that defendants produce to plaintiff certain documents, including "sign-in" sheets and logbooks, that would identify DOCCS personnel present in the MHU at Auburn at any time during the 7:00 a.m. to 3:00 p.m. shift on April 16, 2012. Dkt. No. 30. Defendants were directed t produce those documents on or before July 16, 2014. *Id.* Significantly, plaintiff did not request the court's assistance enforcing that order until he submitted his opposition to the pending motion for summary. Dkt. No. 43-2. In light of plaintiff's delay in seeking court intervention, and because it appears that defendants have made a good faith effort to comply with the court's orders compelling production, I do not view this issue as an impediment to deciding the present summary judgment motion.

Turning now to plaintiff's contention that the timecard submitted by defendant Reilly is not authenticated and may have been altered, I find it unsupported by any record evidence and therefore not a basis upon which I may conclude a genuine dispute of material fact exists for trial. Dkt. No. 43-1 at 5-6; *see Ying Jing Gan v. City of N.Y.*, 996 F.2d 522, 532 (2d Cir. 1993) (holding that the nonmoving party may not defeat a motion for summary judgment based "simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible"). In light of plaintiff's verified complaint, however, which contains an allegation that defendant Reilly was present and participated in the assault of plaintiff on April 16, 2012, I ordinarily would conclude that such conflicting accounts would present a triable issue of fact, turning on witness credibility, that would preclude the entry of summary judgment. *See Rule v. Brine*, Inc. 85 F.3d 1002, 1011 (2d Cir. 1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."). The Second Circuit, however, has recognized a very limited exception to this general rule in *Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005). In that case, the court held that summary judgment may be awarded in the rare circumstance where there is nothing in the record to support the plaintiff's allegations, aside from his own contradictory and incomplete testimony,

and even after drawing all inferences in the light most favorable to the plaintiff, the court determines that "no reasonable person" could credit the his testimony. *Jeffreys*, 426 F.3d at 54-55. To qualify for the *Jeffreys* exception, a defendant must satisfy each of the following three requirements: (1) "the plaintiff must rely 'almost exclusively on his own testimony,'" (2) the plaintiff's "testimony must be 'contradictory or incomplete,'" and (3) the plaintiff's testimony must be contradicted by evidence produced by the defense. *Benitez v. Ham*, No. 04-CV-1159, 2009 WL 3486379, at *20-21 (N.D.N.Y. Oct. 21, 2009) (Mordue, J., *adopting report and recommendation by* Lowe, M.J.) (quoting *Jeffreys*, 426 F.3d at 554).

In this instance I find that the requirements for invoking the *Jeffreys* exception are satisfied. The only evidence suggesting defendant Reilly's involvement in the relevant events is plaintiff's uncorroborated allegation in his verified complaint. *See generally* Dkt. No. 1. While, in support of his opposition to the pending motion, plaintiff has submitted an affidavit from a fellow inmate concerning the incident, that inmate does not identify defendant Reilly as one of the corrections officers participating in the extraction of plaintiff from his cell. Dkt. No. 43-2 at 16. In addition, in response to the pending motion, plaintiff does not explicitly deny defendants' contention that defendant Reilly was not at work on April 16,

2012, but instead focuses on defendants' alleged failure to comply with discovery orders. *See generally* Dkt. No. 43-1. Finally, and perhaps most tellingly, in response to the portion of defendants' statement of undisputed material facts, submitted pursuant to rule 7.1(a)(3) of the local rules of practice for this court, stating "[d]efendant Reilly was off and not working in Auburn Correctional Facility on April 16, 2012", plaintiff responded that he "[l]ack[s] sufficient knowledge to truthfully admit or deny." Dkt. No. 43 at 3. Under these circumstances, where the only record evidence that exists to support the allegation that defendant Reilly participated in the assault on April 16, 2012, is plaintiff's self-serving and unsupported statement contained in his complaint, I find that no reasonable factfinder could conclude that defendant Reilly participated in the incident giving rise to plaintiff's claims. *See Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."); *Jeffreys*, 426 F.3d at 554 ("To defeat summary judgment, therefore, nonmoving parties 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)); *Trans Sport, Inc. v. Starter Sportswear, Inc.*, 964 F.2d 186, 188 (2d Cir. 1992) (noting that summary judgment cannot be defeated "on the basis of

conjecture or surmise"); *McMahon v. Fura*, No. 10-CV-1063, 2011 WL

6739519, at *10 (N.D.N.Y. Dec. 23, 2013) (Lowe, M.J. (on consent))

(applying the *Jeffreys* exception where the only evidence supporting the

plaintiff's version of events was his testimony that "he 'must have' been

tased by 'an officer,'" and the defendants offered testimony from the only

officer involved who had a taser that he did not use it).

Accordingly, I recommend that plaintiff's claims against defendant

Reilly be dismissed based upon lack of personal involvement.

IV.    SUMMARY AND RECOMMENDEATION

Defendants have submitted convincing evidence that defendant

Sean Reilly was not involved in the alleged use of excessive force against

plaintiff on April 16, 2012, and indeed was not even working at Auburn on

that date. To counter that proof, plaintiff relies on his allegation in his

verified complaint that Reilly was involved. In view of this and plaintiff's

inability to admit or deny the portion of defendants' rule 7.1(a)(3) statement

regarding the matter, I conclude that no reasonable factfinder could find

that defendant Reilly was present and involved. Accordingly, it is hereby

respectfully

RECOMMENDED that defendants' motion for partial summary

judgment (Dkt. No. 41) be GRANTED, and that plaintiff's claims against

defendant Sean Reilly be DISMISSED with prejudice; and it is further

ORDERED that the clerk is hereby respectfully directed to modify the court's records to reflect the correct spelling of defendant Sean Reilly's name.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:    August 11, 2014
           Syracuse, New York


Not Reported in F.Supp., 1994 WL 23069 (S.D.N.Y.)
**(Cite as: 1994 WL 23069 (S.D.N.Y.))**

H

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Dale HENDRICKSON, Plaintiff,
v.
UNITED STATES ATTORNEY GENERAL, G.L.
Hershberger, United States Bureau of Prisons, Gary
Morgan, Pamela Ashline, Kenneth Walicki, Hulet
Keith, Otisville Medical Department, Defendants.

No. 91 CIV. 8135.
Jan. 24, 1994.

MEMORANDUM AND ORDER

McKENNA, District Judge.

**\*1** On December 4, 1991, pro se plaintiff Dale
Hendrickson ("Plaintiff" or "Hendrickson"), an in-
mate then in confinement at the Federal Correction-
al Institution in Otisville, New York ("Otisville"),
filed this action for injunctive relief and damages
based upon alleged violations of his rights under
the United States Constitution, Amendments I, IV,
V, VI, IX, and XIII, and upon violations of various
laws and/or regulations governing prison adminis-
tration.[FN1] The Complaint named as defendants
G.L. Hershberger ("Hershberger"), the United
States Attorney General ("Attorney General"), Gary
Morgan ("Morgan"), Pamela Ashline ("Ashline"),
Kenneth Walicki ("Walicki"), Hulett Keith
("Keith"), the Bureau of Prisons ("BOP"), and the
Otisville Medical Department ("OTV Medical De-
partment") (collectively "Defendants"). Defendants
moved for judgment on the pleadings pursuant to
Rule 12(c) of the Federal Rules of Civil Procedure,
or, in the alternative, for summary judgment pursu-
ant to Rule 56 of the Federal Rules of Civil Proced-
ure. For the reasons set out below, Defendants' Rule
12(c) motion is granted.

I.

Defendants move to dismiss Plaintiff's Com-
plaint, pursuant to Rule 12(c) of the Federal Rules
of Civil Procedure, for failure to state a claim upon
which relief can be granted. Rule 12(c) provides:

After the pleadings are closed but within such
time as not to delay the trial, any party may move
for judgment on the pleadings. If, on a motion for
judgment on the pleadings, matters outside the
pleadings are presented to and not excluded by
the court, the motion shall be treated as one for
summary judgment and disposed of as provided
in Rule 56, and all parties shall be given reason-
able opportunity to present all material made per-
tinent to such a motion by Rule 56.

Fed.R.Civ.P. 12(c). "[T]he same standards that
are employed for dismissing a complaint for failure
to state a claim under Fed.R.Civ.P. 12(b)(6) are ap-
plicable" to a Rule 12(c) motion to dismiss for fail-
ure to state a claim upon which relief can be gran-
ted. *See Ad–Hoc Comm. of the Baruch Black &
Hispanic Alumni Ass'n v. Bernard M. Baruch Col-
lege,* 835 F.2d 980, 982 (2d Cir.1987); *see also Vi-
acom Int'l. Inc. v. Time, Inc.,* 785 F.Supp. 371, 375
n. 11 (S.D.N.Y.1992); 5A Charles Wright and Ar-
thur R. Miller, *Federal Practice and Procedure* ¶
1367, at 515–16 (1990). Thus, the Court must read
the Complaint generously, drawing all reasonable
inferences from the complainant's allegations. *See
California Motor Transp. v. Trucking Unlimited,*
404 U.S. 508, 515 (1972). Moreover,
"consideration is limited to the factual allegations
in [the] amended complaint, which are accepted as
true, to documents attached to the complaint as an
exhibit or incorporated in it by reference, to matters
of which judicial notice may be taken, or to docu-
ments either in plaintiff['s] possession or of which
plaintiff[ ] had knowledge and relied on in bringing
suit." *Brass v. American Film Technologies, Inc.,*
987 F.2d 142 (2d Cir.1993); *accord Allen v. West-
point–Pepperell, Inc.,* 945 F.2d 40, 44 (2d
Cir.1991); *Cortec Indus., Inc. v. Sum Holding L.P.,*
949 F.2d 42, 47–48 (2d Cir.1991), *cert. denied,* 112
S.Ct. 1561 (1992); *Frazier v. General Elec. Co.,*
930 F.2d 1004, 1007 (2d Cir.1991). Defendants,
therefore, are entitled to dismissal for failure to

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

state a claim only if the Court finds beyond a doubt that "plaintiff can prove no set of facts" to support the claim that plaintiff is entitled to relief. *See Conley v. Gibson,* 355 U.S. 41, 45–46 (1957).

**\*2** Because the 3(g) statement and declarations submitted to this Court by Defendants have not been considered and are hereby excluded from the record, the Court renders its judgment on the pleadings pursuant to Rule 12(c).

### II.

Drawing all inferences in favor of the Plaintiff, *Miller v. Polar Molecular Corp.,* 12 F.3d 1170, 1993 WL 527434 (2d Cir.), the facts are as follows.

During Hendrickson's confinement at Otisville, certain video tapes which had been supplied to him by the government were "systematically and maliciously confiscated"; audio tapes and legal materials also were removed from Plaintiff's possession while he was a pre-trial detainee at Otisville. In retaliation for his bringing legal materials into the Otisville compound area, Plaintiff claims, he was placed in administrative detention. Compl. at 1 (presumably ¶ A.)

Hendrickson also claims at various times to have been wrongly isolated from the general prison population based on alleged and allegedly erroneous OTV Medical Department claims that he had tuberculosis. *Id.* ¶ B. During these periods of medical confinement, Hendrickson claims that the "4A unit team" denied him personal visits, his right to send mail, and telephone communications and consultations necessary to his legal representation. *Id.* ¶ C.

Hendrickson claims that as part of his medical confinement he was "subjected to ruthless and inhumane [d]isciplinary action from the D[isciplinary] H [earing] O[fficer]," and was for 15 days placed in administrative detention and for 30 days deprived of commissary, visitation, and phone privileges. *Id.* ¶ D.

Hendrickson further alleges that commissary items that he had in his possession before entering medical confinement were wrongly confiscated from him, and while in such confinement he was assaulted and searched by the "OTV Riot Squad." *Id.* ¶ E. In addition, he claims, commissary receipts, as well as legal documents and other legal materials were confiscated from him. *Id.* ¶ F.

### III.

Defendants argue that Plaintiff fails to state a claim for which relief may be granted. Of course, in considering a pro se pleading, the Court takes into consideration the special circumstances of pro se litigants. As the Second Circuit has often noted, "special solicitude should be afforded pro se litigants generally, when confronted with motions for summary judgment." *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988); *accord, e.g., Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 642 (2d Cir.1988); *Beacon Enters., Inc. v. Menzies,* 715 F.2d 757, 767 (2d Cir.1983). We apply the same solicitous standard to the instant motion to dismiss.

Plaintiff, however, has failed to present to this Court either a colorable theory of violation of legal duties or facts to support a claim that might be inferred from the pleadings. Even assuming the truth of Plaintiff's allegations, the Court is left without a cognizable claim before it.

**\*3** At the outset, the Court notes that to the extent that the Complaint seeks injunctive relief from conditions of Plaintiff's treatment while at Otisville as a pre-trial detainee, the claim is now moot as Plaintiff has since been transferred to the United States Penitentiary in Lompoc, California following his conviction at trial. Hendrickson's Complaint also fails to the extent that it seeks damages from the United States government or government officials in their official capacity. Because the United States government enjoys sovereign immunity, it can be sued only to the extent it so consents. *United States v. Mitchell,* 445 U.S. 535, 538 (1980) (quoting *U.S. v. Sherwood,* 312 U.S. 584, 586 (1941)). No such immunity has been waived in

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

suits for damages arising from constitutional violations. *Keene Corp. v. United States,* 700 F.2d 836, 845 n. 13 (2d Cir.), *cert. denied,* 464 U.S. 864 (1983). Thus, the only possible redress remaining available to Plaintiff for the harms alleged is a *Bivens* action [FN2] against government officials in their personal capacities for actions taken under the color of governmental authority.

As Defendants point out, however, Plaintiff has nowhere, other than in the caption of the Complaint, mentioned by name any of the individual named Defendants. Defs.' Mem.Supp.Mot.Dismiss or Summ.Jt. at 2. It is true that Plaintiff did in the body of the Complaint name the "4A Unit Team," the "DHO," and the "OTV Riot Squad," but these designations of group actions undifferentiated as to individuals and of official titles unconnected to any individual names do not allege the actionable *individual* behavior necessary to sustain a *Bivens* claim.

In a *Bivens* action, where Defendants are sued in their personal capacities, actionable behavior must be alleged as to individuals. *See, e.g., Ostrer v. Aronwald,* 567 F.2d 551, 553 (2d Cir.1977); *Barbera v. Smith,* 836 F.2d 96, 99 (2d Cir.1987), *cert. denied,* 489 U.S. 1065 (1989). A complaint that fails to make any specific factual allegations of "direct and personal responsibility on the part of any of the named defendants in regard to the loss of any of [plaintiff's] property" must be dismissed. *Lee v. Carlson,* 645 F.Supp. 1430, 1436 (S.D.N.Y.1986).

More importantly, the light in which a pro se complaint may be considered does not burn so brightly as to blind the court as to the rights of defendants who are entitled to have claims against them alleged with sufficient clarity as to make possible a defense. Even in a pro se complaint, claims must "specify in detail the factual basis necessary to enable [defendants] intelligently to prepare their defense ..." *Ostrer v. Aronwald,* 567 F.2d 551, 553 (2d Cir.1977). Otherwise, blameless parties would be subject to damages claims for free-floating innuendo. To be sufficient before the law, a complaint

must state precisely who did what and how such behavior is actionable under law. Although the Court may make special efforts to understand the underlying claim of a vague, confusing, or poorly crafted pro se complaint that it would not undertake in connection with a claim prepared by legal counsel, it cannot do so to the extent that this would work an injustice to defendants, whose rights also must be protected. A defendant who is alleged to be liable for his actions has a right to have the claims against him spelled out with a basic degree of clarity and particularity. *See supra* at 7. Although some of the harms alleged by Plaintiff might conceivably be of some substance, the Court cannot understand from the documents before it which defendants are alleged to have participated in which allegedly actionable behavior. The Court cannot on such a basis subject a party to potential liability. *See* Defs' Mot. at 9, 10.

*Summary and Order*

**\*4** For the reasons stated, Plaintiff has failed to plead a colorable case. Defendants' motion to dismiss is granted.

> FN1. The Complaint states only that "Bureau of Prison institutional Law" was violated; subsequent documents filed by Plaintiff imply the violation of specific prison policies. *See, e.g.,* Letter from Hendrickson to Judge McKenna of 10/13/93 at 2 (citing BOP Policy Statement 1315.3 purportedly concerning prisoner access to legal materials while in administrative detention).

> FN2. *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971).

S.D.N.Y.,1994.
Hendrickson v. U.S. Atty. Gen.
Not Reported in F.Supp., 1994 WL 23069 (S.D.N.Y.)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 23069 (S.D.N.Y.)
**(Cite as: 1994 WL 23069 (S.D.N.Y.))**

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Henry BENITEZ, Plaintiff,
v.
HAM, et al., Defendant.
No. 9:04-CV-1159.

Oct. 21, 2009.
Henry Benitez, Malone, NY, for Plaintiff.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Timothy P. Mulvey, Esq., of Counsel, Syracuse, NY, for Defendants.

***ORDER***

NORMAN A. MORDUE, Chief Judge.

**\*1** The above matter comes to me following a Report-Recommendation by Magistrate Judge George H. Lowe, duly filed on the 30th day of September 2009. Following ten days from the service thereof, the Clerk has sent me the file, including any and all objections filed by the parties herein.

After careful review of all of the papers herein, including the Magistrate Judge's Report-Recommendation, and no objections submitted thereto, it is

ORDERED that:

1. The Report-Recommendation is hereby adopted in its entirety.

2. Defendants' motion for summary judgment (Dkt. No. 92) is GRANTED IN PART AND DENIED IN PART. The following claims are dismissed pursuant to Defendants' motion for summary judgment: (1) the Eighth Amendment claims against Defendants Weissman and Richards arising from their treatment of Plaintiff's severe body itch, left wrist, and right ankle; (2) the claims against Defendant Ham; (3) the claims against Defendants Brousseau and Donelli for their handling of Plaintiff's grievance regarding Defendant Ham; (4) the retaliation claim against Defendants Nephew, Desotelle, and Snyder based on their filing of misbehavior reports against Plaintiff; (5) the claims against Defendants Brousseau, Donelli, Girdich, and Eagen regarding their handling of Plaintiff's grievances regarding the events of January 2 and 3, 2003; (6) the claim against Defendant LaClair; (7) the claims against Defendant Bullis; and (8) the Eighth Amendment claim against Defendants Weissman and Girdich for approving the imposition of the loaf diet.

It is further ordered that the following claims are dismissed sua sponte pursuant to 28 U.S.C. § 1915(e)(2)(B): (1) Plaintiff's retaliation claim against Defendants Weissman and Richards; and (2) the claim against Defendant Selsky.

It is further ordered that the following claims survive summary judgment and sua sponte review and proceed to trial: (1) the conspiracy claim against Defendants Wright, Snyder, and Duprat; (2) the excessive force claim against Defendants Snyder, Duprat, Bogett, and Wright; (3) the retaliation claim against Defendants Snyder, Duprat, Bogett, and Wright arising from the use of excessive force; (4) the retaliation claim against Wright arising from his filing of a misbehavior report against Plaintiff; (5) the failure to intervene claims against Defendants Bezio and Duprat; (6) the retaliation claim against Defendant Bezio; and (7) the Eighth Amendment claims against Defendants Hensel, Goodwin, Kuhlman, and Costello.

3. The Clerk of the Court shall serve a copy of this Order upon all parties and the Magistrate Judge assigned to this case.

**IT IS SO ORDERED.**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

***REPORT-RECOMMENDATION AND ORDER***

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Norman A. Mordue, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Henry Benitez alleges that 21 employees of the New York Department of Correctional Services ("DOCS") violated his constitutional rights by subjecting him to excessive force, denying him medical care, falsifying misbehavior reports, denying him assistance to prepare for a disciplinary hearing, and imposing a loaf diet on him as punishment. Currently pending before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 92.) For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

**I. FACTUAL AND PROCEDURAL SUMMARY**

**\*2** Unless otherwise noted, the facts in this summary are taken from Plaintiff's verified complaint.[FN1] Plaintiff, a New York state prisoner, was transferred to Upstate Correctional Facility on September 14, 2002. (Dkt. No. 1 ¶ 8.) Plaintiff alleges that he was suffering from "ongoing severe pain in his left hand wrist and right foot ankle due to nerve damage." (Dkt. No. 1 ¶ 9.) From the time he arrived at Upstate, he made "numerous requests" to Defendant Drs. Evelyn Weissman and Richards to receive a medication called Atarax that had been prescribed to him previously at Auburn Correctional Facility, an MRI of his left wrist and right ankle, and a referral to an orthopedist. (Dkt. No. 1 ¶ 12.) Plaintiff alleges that Defendants Weissman and Richards refused his requests for Atarax, the MRI, and the referral "in retaliation for his having filed numerous formal grievances against them [and other Upstate medical staff members] within a period of two years, and for the purpose of preventing [Plaintiff] from demonstrating in a civil rights action against prison officials the extent of the injuries of his left hand and right foot." (Dkt. No. 1 ¶ 12-13.) Plaintiff alleges that, as a result, he continues to experience severe pain in his left

wrist and right ankle, numbness in different areas of his left hand and right foot, an inability to walk or stand for longer than ten minutes, and ongoing severe body itch. (Dkt. No. 1 ¶ 14.)

> FN1. Only two of the named Defendants filed affidavits supporting Defendants' motion for summary judgment. Only one of those affidavits-the affidavit of Defendant Dr. Evelyn Weissman-contradicts Plaintiff's version of events.

Regarding Plaintiff's requests for Atarax, Dr. Weissman declares that Atarax is

non-formulary, which means we do not regularly stock that medication, and special approval must be obtained to issue that medication. However, Vistaril and Hydroxyzine is the substitute we use for the same purpose as Atarax. Hydroxyzine is the generic form of Atarax. I prescribed Vistaril for [P]laintiff on October 2, 2002 ... Dr. Richards requested approval for Atarax in April 2004 and it was suggested that [P]laintiff try Claritin, which had become a formulary (regularly stocked) drug. Dr. Richards requested approval for Atarax again in June 2004, and the response was that if the generic (Hydroxyzine) had not worked, it was unclear that the branded drug Atarax would work ... Plaintiff's complaints of itching were not ignored, and he [was] constantly given medication for itching.

(Weissman Aff. ¶¶ 4-10.)

As to Plaintiff's other claims, Dr. Weissman declares:

Regarding [P]laintiff's claim that his request for an MRI was denied, Dr. Richards and I felt, in our medical judgment, an MRI was not warranted. However, because his pain and numbness was improving with time, Dr. Richards requested, and I approved, physical therapy for [P]laintiff beginning in January 2003. Regarding [P]laintiff's claim that his request for an orthopedic consult was denied, that is incorrect. Dr. Richards requested an orthopedic consult for [P]laintiff on August 19, 2003 and [P]laintiff saw an orthopedist

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

on September 4, 2003. The orthopedist ... did not suggest an MRI and determined that [P]laintiff was improving and "... there is not much else that I can suggest for Henry to improve or accelerate his healing. For the time being, I am just going to suggest that he be patient."

**\*3** (Weissman Aff. ¶¶ 11-13.)

Plaintiff was transferred to Elmira Correctional Facility Reception Center on November 7, 2002, for a court appearance. Upon arrival, Plaintiff informed Defendant Correction Officer Ham that he suffered "ongoing severe pain in his left hand wrist and right foot ankle due to nerve damage, and that the handcuffs and leg irons ... were too tight and causing him swelling and enormous pain." Ham observed that Plaintiff's hands were swollen. However, he refused to remove or loosen the restraints. Plaintiff remained in the restraints, suffering enormous pain and swelling, until he was transferred to Five Points Correctional Facility three hours later. (Dkt. No. 1 ¶ 9.)

Plaintiff was returned to the Elmira Correctional Facility Reception Center on November 14, 2002. At that time, Plaintiff again informed Defendant Ham that the restraints were too tight and were causing him swelling and extreme pain. Defendant Ham "again verbally acknowledged that [Plaintiff]'s hands were ... swollen" but refused to remove the restraints. Plaintiff remained in the restraints, suffering enormous pain and swelling, until he was transferred out of the facility three hours later. (Dkt. No. 1 ¶ 10.)

On January 2, 2003, Defendant Correction Officers Nephew and Desotelle strip-frisked Plaintiff [FN2] in preparation for transferring Plaintiff for a court appearance. Defendant Sgt. Snyder was also in the room. When they had completed the search, Defendant Nephew ordered Plaintiff to put on his coat. Plaintiff told Nephew that wearing the coat would "severely aggravate his continuing body itch stemming from his hepatitis virus." (Dkt. No. 1 ¶ 15.) Defendant Snyder called Plaintiff a "spick" and threatened to forcibly put the coat on Plaintiff.

Plaintiff told Defendants Snyder, Nephew, and Desotelle that he would sue them if they used force. (Dkt. No. 1 ¶ 15.)

> FN2. Plaintiff does not allege that the strip-frisk violated his constitutional rights. Even if he did, I would find that such a claim would not survive *sua sponte* review under 28 U.S.C. § 1915(e)(2)(B). Strip searches conducted in a prison setting are constitutional if they are reasonably related to a legitimate penological goal and are conducted in a reasonable manner. *Frazier v. Ward,* 528 F.Supp. 80, 81 (N.D.N.Y.1981). "However, a strip search is unconstitutional if it is unrelated to any legitimate penological goal or if it is designed to intimidate, harass, or punish. *See, e.g., Iqbal v. Hasty,* 490 F.3d 143, 172 (2d Cir.2007) (pretrial detainee alleged Fourth Amendment violation where he was subjected to repeated strip and body cavity searches that were not related to legitimate government purposes and designed to punish); *Covino,* 967 F.2d at 80 (strip search accompanied by physical and verbal abuse is unconstitutional); *Hodges v. Stanley,* 712 F.2d 34, 35-36 (2d Cir.1983) (second strip search performed soon after a first strip search served no legitimate interest when prisoner was under continuous escort); *Jean-Laurent v. Wilkerson,* 438 F.Supp.2d 318, 323 (S.D.N.Y.2006)." *Miller v. Bailey,* No. 05-CV-5493, 2008 U.S. Dist. LEXIS 31863, at \*1, 2008 WL 1787692, at \*9 (E.D.N.Y. Apr. 17, 2008). Plaintiff does not allege, and the evidence does not show, that Defendants conducted the strip-frisk with an intent to intimidate, harass, or punish Plaintiff.

Shortly thereafter, Defendant Lt. Wright approached Plaintiff and asked him if he had spit at staff. Before Plaintiff could respond, Defendant Wright ordered several guards to get a video camera and put a "spittle mask" on Plaintiff. After the guards did so, Defendant Wright escorted Plaintiff to his cell. He asked Plaintiff to explain what had happened in the frisk room. Plaintiff said that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

Defendant Wright would not believe his account of the incident, accused Defendant Wright of interfering with his court trip and unjustifiably putting a spittle mask on him, and said he would sue Defendants Wright and Snyder. Defendant Wright told Plaintiff that "transportation vans don't have cameras. You're going to learn not to spit ... [at] staff and ... threaten us with lawsuits." (Dkt. No. 1 ¶ 16.)

After Defendant Wright left Plaintiff's cell, Defendant Capt. Bezio approached and asked Plaintiff to explain what happened in the frisk room. Plaintiff told Defendant Bezio what had happened, denied that he had threatened to spit at a staff member, and asked Defendant Bezio to protect him while he was being transported to court. Defendant Bezio told Plaintiff to be "up and ready to go to court" and that "people don't like to get spat ... on." [FN3] (Dkt. No. 1 ¶ 19.)

> FN3. In their motion for summary judgment, Defendants argue that Plaintiff cannot maintain a claim against Defendant Bezio for these statements because (1) Plaintiff did not exhaust his administrative remedies regarding the statements; and (2) threats are not actionable constitutional violations. (Dkt. No. 92-10 at 35-36.) In his opposition to the motion, Plaintiff states that he did not intend to maintain a separate claim against Defendant Bezio based on the statements. Rather, he included this allegation in his complaint to provide relevant information for his failure to intervene claim. (Dkt. No. 109 at 48.) Therefore, I will not address Defendants' arguments regarding these statements.

*4 On January 3, 2003, Defendant Correction Officer Duprat escorted Plaintiff to the transportation van. Defendant Duprat told Plaintiff to "remember what we told you about the van." [FN4] As they were walking, Plaintiff saw Defendant Bezio and told him that Defendant Duprat had threatened to "employ physical abuse" against him in the van. Defendant Bezio shrugged his shoulders. (Dkt. No. 1 ¶ 20.) Defendant Duprat drove Plaintiff in a van to a different building, where he called Defendant

Snyder "to arrange a beating" of Plaintiff. After the phone call, Defendant Duprat drove Plaintiff back to the first building. When they arrived, Defendant Snyder entered the rear section of the van and told Plaintiff that "you like ... suing us. Wright, my boss, doesn't like that and sent this as a reminder." Defendant Snyder then punched and slapped Plaintiff, who was in handcuffs and leg irons, in the face and the back of his head, knocking him unconscious. When Plaintiff revived, Defendants Duprat and Correction Officer Bogett entered the rear section of the van and punched and slapped Plaintiff several times in the head, chest, and right ear. When Plaintiff began to bleed from his right inner ear, Defendants Duprat and Bogett tied a spittle mask on Plaintiff's head. (Dkt. No. 1 ¶¶ 21-22.)

> FN4. In their motion for summary judgment, Defendants argue that Plaintiff cannot maintain a claim against Defendant Duprat for this statement because (1) Plaintiff did not exhaust his administrative remedies regarding the statement; and (2) threats are not actionable constitutional violations. (Dkt. No. 92-10 at 35-36.) In his opposition to the motion, Plaintiff states that he did not intend to maintain a separate claim against Defendant Duprat based on the statement. Rather, he included it in his complaint to provide relevant information for his excessive force claim. (Dkt. No. 109 at 48.) Therefore, I will not address Defendants' arguments regarding these statements.

When Plaintiff arrived at Five Points Correctional Facility later that day, he notified Defendant Nurse Hensel that he had been bleeding from his inner right ear due to a beating by Upstate officials, that he was suffering severe pain in his head and right ear, and that he wanted to be examined by a doctor. Defendant Hensel refused to examine Plaintiff, made no record of his complaints, and refused to schedule Plaintiff to see a doctor.[FN5] (Dkt. No. 1 ¶ 23.)

> FN5. The medical records produced by Defendants in support of their motion for

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

summary judgment do not reflect that Plaintiff saw Nurse Hensel on January 3, 2003. However, as the Court has noted previously (Dkt. No. 99 at 3), a SHU log book entry for January 3, 2003, indicates that Plaintiff was "taken to strip frisk room for pictures and to be assessed by R/N Hensel." (Defs.' Resp. to P.'s 1st Req. for Prod. of Docs., Ex. E at 11.) This document corroborates Plaintiff's claim that he saw Defendant Hensel on January 3, 2003. I note, however, that none of the parties included the log book entry in their moving or opposing papers.

Plaintiff's medical record from Five Points indicates that on January 3, 2003, the day he arrived, Plaintiff was seen by Nurse Nancy O'Connor Ryerson. She noted that Plaintiff arrived via van with cuffs and chains and spit net, and that he complained of pain and itching. "It was noted that he takes Naprosyn and Benadryl, and he was escorted to 12 Building. Apparently Naprosyn was not sent with him and it is a medication for which he would need a prescription from a doctor. Since this was not an emergency, the procedure is to place the inmate on the regular physician call-out list for an appointment. Nurse Ryerson also noted that he was Hepatitis C positive." (Bannister Aff. ¶ 5.)

On January 4, 2003, Plaintiff notified Defendant Nurse Goodwin [FN6] that he needed emergency medical treatment because of severe pain in his liver, left wrist, and right ear, and that he wanted medicine for his severe body itch. Defendant Goodwin refused to examine Plaintiff, made no record of his complaints, and did not provide any treatment to Plaintiff. (Dkt. No. 1 ¶ 24.)

> FN6. The complaint refers to this defendant as Nurse "Good." However, Defendants state that her name is actually Goodwin. (Dkt. No. 92-10 at 1 n. 1.) I will refer to her as Nurse Goodwin.

Plaintiff's medical records from Five Points indicate that on January 4, 2003, Plaintiff was seen by Nurse "Goon" at his cell after security staff told the nurse that Plaintiff stated his asthma was acting up. Nurse "Goon" 's

note indicated that Plaintiff never acknowledged shortness of breath and that she checked Plaintiff's transfer form and the computer and found that he had no history of asthma. (Bannister Aff. ¶ 6.)

**\*5** On January 5, 2003, Plaintiff alleges that he informed Defendant Nurse Kuhlman [FN7] that he had been bleeding from his inner right ear and that he was suffering from an ongoing, extreme body itch due to his hepatitis C and B virus. Defendant Kuhlman told Plaintiff that she would review his medical chart and return to him. Defendant Kuhlman refused to examine Plaintiff, made no record of his medical complaints, and refused to provide treatment. (Dkt. No. 1 ¶ 25.)

> FN7. The complaint refers to this defendant as Nurse Coleman. As discussed further below, Plaintiff did not serve this defendant. In his opposition to the motion for summary judgment, Plaintiff states that he ultimately learned through discovery that her name is actually Nurse Kuhlman. (Dkt. No. 109 at 6 n. 2.) I will refer to this defendant as Nurse Kuhlman.

Plaintiff's medical records from Five Points show that Defendant Kuhlman saw Plaintiff on January 5, 2003. Her note indicates that she went to his cell for his 4:00 p.m. medications and he complained about the way she distributed the medication [FN8]. He stated that the nurse would be getting a grievance. He was uncooperative and argumentative. (Bannister Aff. ¶ 7.)

> FN8. It is not clear what medications Nurse Kuhlman was distributing, since the Affidavit of Linda Bannister establishes that "nurses cannot give medications until they verify allergies and prescription orders" and that as of January 6, the day after Nurse Kuhlman saw Plaintiff, this verification had not been completed. (Bannister Aff. ¶ 8.)

On January 6, 2003, Plaintiff informed Defendant Nurse Costello that he needed treatment due to great pain in his right ear and his ongoing severe body itch.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

Defendant Costello refused to examine Plaintiff's right ear, made no record of his medical complaint, and refused to promptly provide medical treatment. (Dkt. No. 1 ¶ 26.)

Plaintiff's medical records from Five Points show that Defendant Costello saw him on January 6, 2003. She noted that he was complaining that he needed an emergency prescription for severe headache and severe itching. She noted that he requested a prompt examination by a physician. She instructed him that she would have to find the chart or the transfer paperwork because nurses cannot give medications until they verify allergies and prescription orders. (Bannister Aff. ¶ 8.)

Plaintiff's medical records from Five Points show that he was seen again the next day by Defendant Costello. Plaintiff's chart was still not available, and he again requested a prescription for itching, Hepatitis C, and a physical exam. Defendant Costello again noted that she would have to verify his requests and then possibly schedule an appointment. (Bannister Aff. ¶ 9.)

Plaintiff's medical records from Five Points show that he was seen later that day by non-defendant Nurse Gardner at the request of security staff. Plaintiff stated "I was knocked out and beaten everywhere" and claimed that he had a lump on his head. Nurse Gardner examined him and noted no redness, bruising, or bump on head. (Bannister Aff. ¶ 10.)

Plaintiff alleges that Wright, Nephew, Desotelle, and Snyder retaliated against him for his threat to sue them by filing false misbehavior reports. (Dkt. No. 1 ¶¶ 17-18.) Defendant Correction Officer LaClair was assigned to assist Plaintiff with preparing for the subsequent disciplinary hearing. (Defs.' Ex. 14.)

According to a misbehavior report filed by Defendant LaClair, when he went to Plaintiff's cell to assist him, Plaintiff "stated ... that [LaClair] was to get him what he wanted." Defendant LaClair "informed him that what he needed had to be pertained (sic) to the misbehavior report. [Plaintiff] then stated "Get what I want or I'll fuck you up." Defendant La Clair "informed him the interview was

over and left the area." (Defs.' Ex. 15 at 2-3.) Plaintiff alleges that Defendant LaClair "falsified [the] misbehavior report against [Plaintiff] in order to refrain" from assisting Plaintiff. (Dkt. No. 1 ¶ 35.)

*6 On January 15, 2003, Defendant Bullis arrived at Plaintiff's cell and informed him that he would conduct the disciplinary hearing that day. He asked Plaintiff whether he wanted to attend the hearing. Plaintiff said that he did not because Defendant LaClair had not assisted him, but asked Defendant Bullis to interview Defendant LaClair and an inmate witness about the events leading to Defendant LaClair's refusal to provide assistance. Plaintiff asked Defendant Bullis not to impose a loaf diet as a punishment if he found Plaintiff guilty because the loaf diet caused Plaintiff severe abdominal pains and constipation due to his hepatitis. (Dkt. No. 1 ¶ 36.)

Defendant Bullis did not interview Defendant LaClair or the inmate witness. He found Plaintiff guilty and imposed a penalty of 21 days of the loaf diet. (Dkt. No. 1 ¶ 37.) Plaintiff alleges that Defendants Weissman and Girdich "maliciously" approved the penalty in "reckless disregard" of the pain it would inflict on Plaintiff. (Dkt. No. 1 ¶ 38.) Plaintiff alleges that "[d]ue to the danger that the ... loaf diet posed" to his well-being, he refused to eat it. As a result, he lost 33 pounds and suffered severe abdominal pains and emotional distress that exacerbated his hepatitis. (Dkt. No. 1 ¶ 39.)

Plaintiff alleges that Defendants Brousseau, Donelli, Selsky, Girdich, and Eagen mishandled the grievances and appeals he filed or attempted to file regarding his claims. (Dkt. No. 1 ¶¶ 28-34, 40.)

Plaintiff filed this lawsuit on October 6, 2004. The parties proceeded to discovery, which proved contentious. Plaintiff successfully moved to compel responses to his discovery requests, and thereafter filed four motions for sanctions seeking Defendants' compliance with the order compelling discovery. (Dkt.Nos.56, 73, 94, 103.) I granted each of those motions in part. (Dkt. Nos.62, 79, 99, 107.) As is relevant here, I ruled that because not all of the pages of the Five Points Movement and Control Log Book

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

for November 14, 2003, had been provided to Plaintiff before the original was destroyed, Plaintiff could ask the Court to draw factual inferences favorable to him. (Dkt. No. 99 at 2.) I ruled that because Defendants could not locate the SHU log book for January 2003, Plaintiff could "ask the Court to draw factual inferences favorable to him based upon the missing pages for January 14, 2003" in opposition to Defendants' motion for summary judgment. (Dkt. No. 99 at 1-2.) I noted that Defendants had told Plaintiff that photographs taken of him on January 10, 2003, would be produced but that, without explanation, Defendants could no longer find the photographs. Accordingly, I ruled that Plaintiff could ask the Court to draw factual inferences favorable to him based upon the missing photographs. (Dkt. No. 99 at 2-3.) I ordered that if photographs taken of Plaintiff on January 3, 2003, no longer existed, Plaintiff could similarly request favorable inferences. (Dkt. No. 99 at 3.)

**\*7** On March 16, 2009, Plaintiff again moved for sanctions. (Dkt. No. 103.) I noted that the photographs from January 3 and 10, 2003, were still missing. (Dkt. No. 107 at 1.) I reiterated that Plaintiff could ask the Court to draw factual inferences favorable to him based upon the missing photographs. (Dkt. No. 107 at 2.)

Currently pending before the Court is Defendants' motion for summary judgment. (Dkt. No. 92.) Plaintiff has opposed the motion. (Dkt. No. 109.)

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact

exists. *Major League Baseball Properties, Inc. v. Salvino, Inc.,* 542 F.3d 290, 309 (2d Cir.2008). Only after the moving party has met this burden is the non-moving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord,* 467 F.3d 263, 272-73 (2d Cir.2006). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." [FN9] Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [FN10] In determining whether a genuine issue of material [FN11] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. [FN12]

FN9. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also* Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is properly made [by a defendant] and supported [as provided in this rule], the [plaintiff] may not rely merely on allegations ... of the [plaintiff's] pleading ....").

FN10. *Ross v. McGinnis,* No. 00-CV-0275, 2004 U.S. Dist. LEXIS 9367, at \* 20-21, 2004 WL 1125177, at \*8 (W.D.N.Y. Mar.29, 2004) (internal quotations omitted) (emphasis added).

FN11. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

FN12. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) (citation omitted); *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citation omitted).

### B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnie Gen. Transatlantique,* 405 F.2d 270, 273-74 (2d Cir.1968) (citations omitted); *accord, Katz v. Molic,* 128 F.R.D. 35, 37-38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Moreover, even where a defendant has not advanced such a failure-to-state-a-claim argument on a motion for summary judgment, a district court may, *sua sponte,* address whether a *pro se* prisoner has failed to state a claim upon which relief may be granted. [FN13] For these reasons, it is appropriate to briefly summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

> FN13. The authority to conduct this *sua sponte* analysis is derived from two sources: (1) 28 U.S.C. § 1915(e)(2)(B), which provides that "the court shall dismiss [a] case [brought by a prisoner proceeding *in forma pauperis* ] at any time if the court determines that ... the action ... is frivolous or malicious[,] ... fails to state a claim on which relief may be granted[,] ... or ... seeks monetary relief against a defendant who is immune from such relief"; and (2) 28 U.S.C. § 1915A(b), which provides that, "[o]n review, the court shall ... dismiss the [prisoner's] complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted ...."

**\*8** Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Federal Rule of Civil Procedure 8(a)(2); [FN14] or (2) a challenge to the legal cognizability 14 of the claim. [FN15]

> FN14. *See* 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") (citations omitted). *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ( "The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

> FN15. *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") (citation omitted); *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

between a failure to meet Rule 12[b][6]'s requirement of stating a cognizable claim and Rule 8[a]'s requirement of disclosing sufficient information to put defendant on fair notice; *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig., 379 F.Supp.2d 348, 370 (S.D.N.Y.2005)* ( "Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient complaint [under Rule 12(b)(6)].") (citation omitted); *Util. Metal Research & Generac Power Sys., Inc.,* No. 02-CV-6205, 2004 U.S. Dist. LEXIS 23314, at *4-5, 2004 WL 2613993, at *1-2 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth., 333 F.Supp.2d 91, 101-102 (E.D.N.Y.2004); Tangorre v. Mako's, Inc.,* No.01-CV-4430, 2002 U.S. Dist. LEXIS 1658, at *6-7, 2002 WL 313156 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12(b)(6) motion-one aimed at the sufficiency of the pleadings under Rule 8(a), and the other aimed at the legal sufficiency of the claims).

Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) (emphasis added). By requiring this "showing," Rule 8(a)(2) requires that the pleading contain a short and plain statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." [FN16] The main purpose of this rule is to "facilitate a proper decision on the merits." [FN17] A complaint that fails to comply with this rule "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [FN18]

FN16. *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (holding that the complaint failed to meet this test) (citation omitted; emphasis added); *see*

*also Swierkiewicz, 534 U.S. at 512* (citation omitted); *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993)* (citation omitted).

FN17. *Swierkiewicz, 534 U.S. at 514* (quoting *Conley,* 355 U.S. at 48); *see also Simmons v. Abruzzo, 49 F.3d 83, 86 (2d Cir.1995)* ("Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") (citation omitted); *Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir.1988)* ("[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") (citations omitted).

FN18. *Gonzales v. Wing, 167 F.R.D. 352, 355 (N.D.N.Y.1996)* (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion); *accord, Hudson v. Artuz,* 95-CV-4768, 1998 WL 832708, at *2 (S.D.N.Y. Nov.30, 1998), *Flores v. Bessereau,* No. 98-CV-0293, 1998 U.S. Dist. LEXIS 8750, 1998 WL 315087, at *1 (N.D.N.Y. June 8, 1998) (Pooler, J.). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp., 335 F.3d 152, 156 (2d Cir.2003)* (citing, for similar purpose, unpublished table opinion in *Gronager v. Gilmore Sec. & Co., 104 F.3d 355 (2d Cir.1996)*).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556-57, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Accordingly, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but has not *shown*-that the pleader is entitled to relief." *Iqbal,* 129 S.Ct. at 1950 (emphasis added).

It should also be emphasized that, "[i]n reviewing a complaint for dismissal under Fed.R.Civ.P. 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." [FN19] "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.* "[FN20] In other words, while all pleadings are to be construed liberally under Rule 8(e), *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality.

> FN19. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) (citation omitted); *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

> FN20. *Hernandez,* 18 F.3d at 136 (citation omitted); *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) (citations omitted); *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) (citation omitted).

For example, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint.[FN21] Moreover, "courts must construe *pro se* pleadings broadly, and interpret them to raise the

strongest arguments that they suggest." [FN22] Furthermore, when addressing a *pro se* complaint, *generally* a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." [FN23] Of course, an opportunity to amend is not required where the plaintiff has already amended his complaint.[FN24] In addition, an opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." [FN25]

> FN21. "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* No. 96-CV-7544, U.S. Dist. LEXIS 18131 1997 WL 714878, at * 1, n. 2, 1997 (S.D.N.Y. Nov.17, 1997) (citing, *inter alia, Gil v. Mooney,* 824 F.2d 192, 195 [2d Cir.1987] [considering plaintiff's response affidavit on motion to dismiss] ). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) (citations omitted), *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004). This authority is premised, not only on case law, but on Rule 15 of the Federal Rules of Civil Procedure, which permits a plaintiff, as a matter of right, to amend his complaint once at any time before the service of a responsive pleading-which a motion to dismiss is not. *See Washington v. James,* 782 F.2d 1134, 1138-39 (2d Cir.1986) (considering subsequent affidavit as amending *pro se* complaint, on motion to dismiss) (citations omitted).

> FN22. *Cruz v. Gomez,* 202 F.3d 593, 597 (2d

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) (internal quotation and citation omitted).

FN23. *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

FN24. *Yang v. New York City Trans. Auth.,* No. 01-CV-3933, 2002 U.S. Dist. LEXIS 20223, 2002 WL 31399119, at *2 (E.D.N.Y. Oct.24, 2002) (denying leave to amend where plaintiff had already amended complaint once); *Advanced Marine Tech. v. Burnham Sec., Inc.,* 16 F.Supp.2d 375, 384 (S.D.N.Y.1998) (denying leave to amend where plaintiff had already amended complaint once).

FN25. *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) (citation omitted); *see also* *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) (citation omitted); *see, e.g., See Rhodes v. Hoy,* No. 05-CV-0836, 2007 U.S. Dist. LEXIS 48370, 2007 WL 1343649, at *3, 7 (N.D.N.Y. May 5, 2 0 0 7 ) ( S c u l l i n , J . , a d o p t i n g Report-Recommendation of Peebles, M.J.) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the error in his complaint-the fact that plaintiff enjoyed no constitutional right of access to DOCS' established grievance process-was substantive and not formal in nature, rendering repleading futile); *Thabault v. Sorrell,* No. 07-CV-0166, 2008 U.S. Dist. LEXIS 62919, 2008 WL 3582743, at *2 (D.Vt. Aug. 13, 2008) (denying *pro se* plaintiff opportunity to amend before

dismissing his complaint because the errors in his complaint-lack of subject-matter jurisdiction and lack of standing-were substantive and not formal in nature, rendering repleading futile) (citations omitted); *Hylton v. All Island Cab Co.,* No. 05-CV-2355, 2005 WL 1541049, at *2 (E.D.N.Y. June 29, 2005) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the errors in his complaint-which included the fact that plaintiff alleged no violation of either the Constitution or laws of the United States, but only negligence-were substantive and not formal in nature, rendering repleading futile); *Sundwall v. Leuba,* No. 00-CV-1309, 2001 U.S. Dist. LEXIS 737, 2001 WL 58834, at *11 (D.Conn. Jan.23, 2001) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the error in his complaint-the fact that the defendants were protected from liability by Eleventh Amendment immunity-was substantive and not formal in nature, rendering repleading futile).

**\*9** However, while this special leniency may somewhat loosen the procedural rules governing the form of pleadings (as the Second Circuit has observed), [FN26] it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Rules 8, 10 and 12. [FN27] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Rules 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow. [FN28] Stated more plainly, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." [FN29]

FN26. *Sealed Plaintiff v. Sealed Defendant # 1,* No. 06-1590, 2008 U.S.App. LEXIS 17113, 2008 WL 3294864, at *5 (2d Cir Aug.12, 2008) ("[The obligation to construe the pleadings of *pro se* litigants liberally] entails, at the very least, a permissive application of the rules governing the form of pleadings.") [internal quotation

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

marks and citation omitted]; *see also Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ("[R]easonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training ... should not be impaired by harsh application of technical rules.") (citation omitted).

FN27. *See Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972) (extra liberal pleading standard set forth in *Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), did not save *pro se* complaint from dismissal for failing to comply with Fed.R.Civ.P. 8); *accord, Shoemaker v. State of Cal.,* 101 F.3d 108 (2d Cir.1996) (citing *Prezzi v. Schelter,* 469 F.2d 691) (unpublished disposition cited only to acknowledge the continued precedential effect of *Prezzi v. Schelter,* 469 F.2d 691, within the Second Circuit); *accord, Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995).

FN28. *See McNeil v. U.S.,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") (citation omitted); *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") (citation omitted); *cf. Phillips v. Girdich,* 408 F.3d 124, 128, 130 (2d Cir.2005)

(acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading [ ]or prejudice the adverse party").

FN29. *Stinson v. Sheriff's Dep't of Sullivan County.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980).

**III. ANALYSIS**

**A. Weissman/Richards Health Care**

Plaintiff alleges that Defendant Drs. Weissman and Richards violated his Eighth Amendment right to adequate medical care by prescribing an ineffective medication for his body itch, refusing to order an MRI of his left wrist and right ankle, and refusing to refer him to an orthopedist. (Dkt. No. 1 ¶ 12.) Defendants move for summary judgment of these claims, arguing that (1) Plaintiff did not suffer from a serious medical need; and (2) Defendants were not deliberately indifferent. (Dkt. No. 92-10 at 13-14.)

*1. Eighth Amendment Standard*

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishments. The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment. *Estelle v. Gamble,* 429 U.S. 97, 102-03, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle,* 429 U.S. at 102. Thus, the Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Thus, prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

guarantee the safety of the inmates.' " *Farmer,* 511 U.S. at 832 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526-27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)).

A viable Eighth Amendment claim must contain both an objective and a subjective component. *Farmer,* 511 U.S. at 834. To satisfy the objective component, "the deprivation alleged must be, objectively, 'sufficiently serious.' " *Id.* (quoting *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). Analyzing the objective element of an Eighth Amendment medical care claim requires two inquiries. "The first inquiry is whether the prisoner was actually deprived of adequate medical care." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006). The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.' " *Jones v. Westchester County Dept. of Corr. Med. Dept.,* 557 F.Supp.2d 408, 413 (S.D.N.Y.2008).

**\*10** The second inquiry is "whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin,* 467 F.3d at 280. The focus of the second inquiry depends on whether the prisoner claims to have been completely deprived of treatment or whether he claims to have received treatment that was inadequate. *Id.* If "the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious." *Id.* A "serious medical need" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) (citations omitted), *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor

or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702-03.

If the claim is that treatment was provided that was inadequate, the second inquiry is narrower. *Salahuddin,* 467 F.3d at 280. For example, "[w]hen the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation" is sufficiently serious. *Smith v. Carpenter,* 316 F.3d 178, 185 (2d Cir.2003).

To satisfy the subjective component of an Eighth Amendment medical care claim, the defendant's behavior must be "wanton." What is considered "wanton" must be determined with "due regard for differences in the kind of conduct against which an Eighth Amendment objection is raised." *Whitley v. Albers,* 475 U.S. 312, 320, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). Where a prisoner claims that a defendant provided inadequate medical care, he must show that the defendant acted with "deliberate indifference." *Estelle,* 429 U.S. at 105; *Wilson v. Seiter,* 501 U.S. 294, 302-03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).

Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance,* 143 F.3d at 703 (quoting *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)). Thus, to establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,* 143 F.3d at 702-703. The inmate then must establish that the provider consciously and intentionally disregarded or

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

ignored that serious medical need. *Farmer, 511 U.S. at 835; Ross v. Giambruno, 112 F.3d 505, at *2 (2d Cir.1997).* An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle, 429 U.S. at 105-06.* Moreover, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim ... under the Eighth Amendment." *Id.* Stated another way, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.; Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation."). However, malpractice that amounts to culpable recklessness constitutes deliberate indifference. Accordingly, "a physician may be deliberately indifferent if he or she consciously chooses an easier and less efficacious treatment plan." *Chance,* 143 F.3d at 703 (citation omitted). Medical decisions that are contrary to accepted medical standards may constitute deliberate indifference if "the doctor has based his judgment on something other than sound medical judgment." *Stevens v. Goord,* 535 F.Supp.2d 373, 385 (S.D.N.Y.2008) (citation omitted). For instance, a doctor may be deliberately indifferent if he opts for an easier and less efficacious treatment plan "not on the basis of [his or her] medical views, but because of monetary incentives." *Chance,* 143 F.3d at 704.

### 2. *Atarax*

**\*11** Plaintiff claims that Defendants Weissman and Richards violated his Eighth Amendment rights by refusing to prescribe Atarax. (Dkt. No. 1 ¶¶ 1, 12.) Defendants move for summary judgment, arguing that Plaintiff's claim regarding the Atarax medication fulfills neither the objective nor the subjective prong of a viable Eighth Amendment claim. (Dkt. No. 92-10 at 13-14.)

Regarding the objective prong, the parties' briefs focus entirely on whether Plaintiff suffered from a serious medical need.[FN30] Applying the analytical framework described above, I must first address whether Plaintiff was

actually deprived of adequate medical care. I find that there is a triable issue of fact that the refusal to prescribe Atarax constituted a denial of adequate or reasonable care. I base this finding on the fact that Defendant Dr. Richards twice requested approval to prescribe Atarax, noting that he had already tried treating Plaintiff with Hydroxyzine, Vistril, Allegra, and Zytrec "all of which worsened [Plaintiff's] condition." (Weissman Aff. Ex. A-9.)

> **FN30.** Defendants argue that Plaintiff's severe body itch was not a serious medical need because it was not a "condition of urgency, one that may produce death, degeneration, or extreme pain". (Dkt. No. 92-10 at 13.) Plaintiff argues that severe body itch was a symptom of his Hepatitis C, which is a serious medical need. (Dkt. No. 109 at 28-30.)

Because Plaintiff alleges that he was provided with inadequate treatment, rather than completely deprived of treatment, the next inquiry is whether the *deprivation* was sufficiently serious. This requires an analysis of what harm, if any, the failure to prescribe Atarax caused or will cause Plaintiff. Here, there is simply no evidence before the Court that being deprived of Atarax harmed or threatened to harm Plaintiff. Rather, the evidence shows that Plaintiff suffered from a severe body itch. While this condition was undoubtedly unpleasant, it simply does not rise to the level of an Eighth Amendment violation. Therefore, I find that Plaintiff has not raised a triable issue of fact regarding the objective prong of his Eighth Amendment claim regarding Defendant Weissman and Richards' failure to prescribe Atarax.

Having found that there is not a triable issue of fact as to the objective prong, it is not necessary to analyze the subjective prong. However, I will briefly address the parties' contentions for the sake of completeness. Defendants argue that the refusal by Defendants Weissman and Richards to prescribe Atarax was not deliberate indifference because the decision of "which medicine to prescribe for a particular condition amount[s] to nothing more than a disagreement with the course of treatment-not deliberate indifference." (Dkt. No. 92-10 at

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

13-14.) Defendants' argument regarding deliberate indifference is based entirely on the affidavit of Dr. Weissman. [FN31] Interestingly, in contrast to her statements regarding Plaintiff's orthopedic care (discussed below), Dr. Weissman does *not* state that the decision not to prescribe Atarax was based on her medical judgment. Rather, she states that Atarax is a "non-formulary" medication and "special approval must be obtained to issue that medication." (Weissman Aff. ¶ 4.) Dr. Weissman does not say who was authorized to approve the use of non-formulary drugs. Dr. Richards twice requested approval to prescribe Atarax to Plaintiff. (Weissman Aff. ¶¶ 7-8, Ex. A-9 and A-10.) In one of these requests, he stated that the other medications he had tried "worsened" Plaintiff's condition. (Weissman Aff. Ex. A-9.) His requests were denied. (Weissman Aff. ¶¶ 7-8, Ex. A-9 and A-10.) This sequence of events raises two interesting and related issues: does the acquiescence of Dr. Weissman and Dr. Richards to a course of treatment for Plaintiff with which they disagreed constitute deliberate indifference? [FN32] Or does the fact that the decision not to prescribe Atarax was made by someone other than Dr. Weissman and Dr. Richards indicate that they were not personally involved with, and thus not liable for, the decision? *See Johnson v. Wright,* 412 F.3d 398 (2d Cir.2005) (claims against administrators who refused to approve treatment requested by treating physicians survived summary judgment; treating physicians were not named as defendants). The parties have not addressed these issues, and, due to my finding that there is no triable issue of fact as to the objective prong and in the absence of briefing, I decline to do so.

FN31. Dr. Richards did not file an affidavit supporting Defendants' motion for summary judgment.

FN32. *See Sulton v. Wright,* 265 F.Supp.2d 292 (S.D.N.Y.2003) (holding that a prisoner stated an Eighth Amendment claim against a doctor and physician's assistant who pursued less vigorous treatment than they had originally recommended when their request for approval of knee surgery was denied).

3. *MRI and Orthopedic Referral*

**\*12** Plaintiff claims that Defendants Weissman and Richards violated his Eighth Amendment rights by refusing to take MRIs of his left wrist and right ankle or to refer him to an orthopedist who could determine if medical footwear was necessary to correct his right foot problem. (Dkt. No. 1 ¶ 12.) Defendants argue that (1) any deprivation was not sufficiently serious to trigger Eighth Amendment scrutiny; and (2) they were not deliberately indifferent. (Dkt. No. 92-10 at 13-14.) Defendants are correct.

Even if one assumes that the deprivation was sufficiently serious to trigger Eighth Amendment scrutiny, the evidence does not raise a triable issue of fact that Defendants were deliberately indifferent. Regarding the MRIs, Dr. Weissman declares that "Dr. Richards and I felt, in our medical judgment, an MRI was not warranted." Because Plaintiff's "pain and numbness was improving with time, Dr. Richards requested, and I approved, physical therapy for [P]laintiff beginning in January 2003." (Weissman Aff. ¶ 11.) In September 2003, Dr. Richards referred Plaintiff to an orthopedist for treatment of his left wrist because, after completing physical therapy, Plaintiff was "still having [a] considerable amount of pain." (Weissman Aff. Ex. A-13.) The orthopedist examined Plaintiff and reported that Plaintiff "seems to be improving at this point and unfortunately, there is not much else I can suggest for Henry to improve or accelerate his healing." (Weissman Aff. Ex. A-14.)

Plaintiff filed a grievance a year after seeing the orthopedist complaining that Dr. Richards and Dr. Weissman "willfully refused to examine my injuries, to provide medical treatment for said injuries, and to order an MRI test of said injuries conducted ... in an attempt to prevent me from proving the precise nature and extent of my injuries in a court of law and, thus, to dissuade me from suing." (P.'s Decl. in Opp'n to Aff. of Evelyn Weissman, Ex. D.) Plaintiff argues that this grievance proves that he "continued to complain to these defendants about continuing severe pain in his left wrist and right ankle for more than one year after he had been evaluated

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

by the orthopedist." (Dkt. No. 109 at 24-25.) The grievance Plaintiff cites does not mention any "continuing severe pain in his left wrist and right ankle." Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's Eighth Amendment claims against Defendants Weissman and Richards.[FN33]

> FN33. Plaintiff's complaint also asserts a retaliation claim against Defendants Weissman and Richards on these facts. (Dkt. No. 1 ¶ 12.) Defendants have not addressed this claim. I find that it is subject to *sua sponte* dismissal pursuant to 28 U.S.C. § 1915(e) (2)(B) because the evidence does not establish that Defendants took adverse action. While the denial of medical care may establish adverse action, *see e.g. Odom v. Poirier,* No. 99 Civ. 4933, 2004 WL 2884409, at * 4 (S.D.N.Y. Dec.10, 2004), I have found that Defendants Weissman and Richards did not deny Plaintiff medical care. Therefore, I recommend that the Court dismiss this claim.

**B. Ham/Grievances**

Plaintiff alleges that Defendant Ham violated his Eighth Amendment rights by refusing to loosen or remove his restraints on November 7 and 14, 2002. (Dkt. No. 1 ¶¶ 9-10.) He further alleges that Defendants Brousseau and Donelli violated his constitutional rights by refusing to forward his grievance regarding Defendant Ham for an investigation. (Dkt. No. 1 ¶¶ 28-29.) Defendants argue that (1) Plaintiff failed to exhaust his administrative remedies regarding his claims against Defendant Ham; (2) Plaintiff's allegations are not "sufficiently serious" to implicate the Eighth Amendment; and (3) Plaintiff's allegations regarding the handling of his grievance do not raise a constitutional claim. (Dkt. No. 92-10 at 21-23, 38.)

1. *Exhaustion of Administrative Remedies*

**\*13** Defendants argue that Plaintiff failed to exhaust his administrative remedies regarding his claims against Defendant Ham. (Dkt. No. 92-10 at 21-23.) I find that there is a triable issue of fact that Plaintiff's failure to

receive a final decision on the merits of his grievance regarding Defendant Ham was justified.

The Prison Litigation Reform Act ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." [FN34] "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." [FN35] The Department of Correctional Services ("DOCS") has available a well-established three-step inmate grievance program.[FN36]

> FN34. 42 U.S.C. § 1997e.

> FN35. *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

> FN36. 7 N.Y.C.R.R. § 701.7.

Generally, the DOCS Inmate Grievance Program ("IGP") involves the following procedure for the filing of grievances.[FN37] First, an inmate must file a complaint with the facility's IGP clerk within twenty-one (21) calendar days of the alleged occurrence. If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. A representative of the facility's inmate grievance resolution committee ("IGRC") has sixteen (16) calendar days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen (16) calendar days of receipt of the grievance, and issues a written decision within two (2) working days of the conclusion of the hearing. Second, a grievant may appeal the IGRC decision to the facility's superintendent within seven (7) calendar days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within twenty (20) calendar days of receipt of the grievant's appeal. Third, a grievant may appeal to the central office review committee ("CORC") within seven

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

(7) working days of receipt of the superintendent's written decision. CORC is to render a written decision within thirty (30) calendar days of receipt of the appeal. It is important to note that any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can be appealed to the next level, including CORC, to complete the grievance process.[FN38] If a prisoner has failed to properly follow each of the applicable steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006).

> FN37. 7 N.Y.C.R.R. §§ 701.5, 701.6(g), 701.7; *see also White v. The State of New York,* No. 00-CV-3434, 2002 WL 31235713, at *2 (S.D.N.Y. Oct.3, 2002).

> FN38. 7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *Hemphill v. New York,* 198 F.Supp.2d 546, 549 (S.D.N.Y.2002), *vacated and remanded on other grounds,* 380 F.3d 680 (2d Cir.2004); *see, e.g., Croswell v. McCoy,* 01-CV-0547, 2003 U.S. Dist. LEXIS 3442, at *12, 2003 WL 962534, at *4 (N.D.N.Y. March 11, 2003) (Sharpe, M.J.) ("If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA."); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him."); *Nimmons v. Silver,* 03-CV-0671, Report-Recommendation, at 15-16 (N.D.N.Y. filed Aug. 29, 2006) (Lowe, M.J.) (recommending that the Court grant Defendants' motion for summary judgment, in part because plaintiff adduced no evidence that he appealed the lack of a timely decision by the facility's IGRC to the next level, namely to either the facility's superintendent or CORC), *adopted by* Decision and Order (N.D.N.Y. filed Oct. 17,

2006) (Hurd, J.).

Here, Plaintiff declares that on the day of the first incident with Defendant Ham, he asked a Five Points Correctional Facility officer for a grievance form. (P.'s Decl. in Opp'n to Aff. of Karen Bellamy ¶ 17.) The officer did not give Plaintiff a form and told Plaintiff that he would need to file his grievance at Elmira Correctional Facility, where the incident had occurred. *Id.* Although an April 16, 2004, revision to the inmate grievance procedure specified that grievances "may only be filed at the facility where the inmate is housed even if it pertains to another facility," (*Id.,* at Ex. A), the procedures in effect at the time Plaintiff asked for a form to file a complaint against Defendant Ham were silent as to which facility should handle a particular grievance. Even if one assumes that the Five Points officer's advice was correct under DOCS practice at the time, it is difficult to see how Plaintiff could have filed a grievance at Elmira. Plaintiff was only at Elmira Correctional Facility for a few hours after receiving these instructions from the officer, during which time he was handcuffed and shackled. (Dkt. No. 1 ¶ 10.)

**\*14** On December 8, 2002, Plaintiff filed a grievance at Upstate Correctional Facility regarding Defendant Ham's actions. (Dkt. No. 92-4, Ex. 4.) Defendant Brousseau, the IGP supervisor, returned the grievance to Plaintiff because Plaintiff failed to submit it within fourteen days of the incident.[FN39] *Id.*

> FN39. The inmate grievance procedures in place at the time of the incident required inmates to file grievances within 14, rather than 21, days.

On December 18, 2002, Plaintiff submitted a grievance complaining that Defendant Brousseau's refusal to accept the previous grievance violated his constitutional right of access to the courts because it prevented him from exhausting his claims against Defendant Ham. (Dkt. No. 92-4, Ex. 4.) The IGRC denied Plaintiff's grievance on December 26, 2002. *Id.* The IGRC stated that Defendant Brousseau's refusal was proper because Plaintiff "did not present any mitigating circumstances that would warrant accepting the [untimely] complaint ... [Plaintiff] had been

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

back at the facility since 11/15/02 and had filed one grievance during this time period, this shows he had ample opportunity to file this complaint in a timely manner." *Id.* The grievance to which the IGRC's decision referred was a grievance regarding Defendant Richards' denial of Atarax. (Dkt. No. 92-4, Ex. 3.) Because that event occurred at Upstate Correctional Facility, there was no ambiguity about where Plaintiff's grievance should be filed.

Plaintiff appealed the IGRC's determination to the Superintendent. (Dkt. No. 92-4, Ex. 4.) Defendant Donelli affirmed the IGRC's determination on January 15, 2003. *Id.*

Defendants assert that Plaintiff "did not appeal [Defendant Donelli's decision] to the CORC." (Dkt. No. 92-3, Stmt. Pursuant to Rule 7.1(a)(3) ¶ 8.) For this proposition, they cite Exhibit 4 and to the Affidavit of Karen Bellamy. *Id.* Exhibit 4 shows that Plaintiff signed an "Appeal Statement" stating that he wished to appeal Defendant Donelli's decision to CORC. (Dkt. No. 92-4, Ex. 4.) The Appeal Statement was signed by a grievance clerk. *Id.* That exhibit also shows that Defendant Brousseau responded to an inquiry regarding the status of the grievance by stating that the grievance had been received by CORC and was being processed. *Id.* However, the record before the Court does include any final disposition from CORC of Plaintiff's appeal. The appeal does not appear in a list provided in the Affidavit of Karen Bellamy of grievances on which Plaintiff received a final decision from CORC. (Bellamy Aff. Ex. B.) Thus, Plaintiff never received a decision from CORC and did not exhaust his administrative remedies. *See Mendez v. Artuz,* No. 01 CIV. 4157, 2002 U.S. Dist. LEXIS 3263, at * 4, 2002 WL 313796, at * 2 (S.D.N.Y. Feb.27, 2002). Even if CORC had acted on Plaintiff's appeal, I assume that CORC would have upheld the IGRC's finding and denied Plaintiff's grievance as untimely. In that event, I would find that Plaintiff had not exhausted his administrative remedies because "courts consistently have found that CORC's dismissal of a grievance appeal as untimely constitutes failure to exhaust available administrative remedies." *Soto v. Belcher,* 339 F.Supp.2d 592, 595

(S.D.N.Y.2004).

**\*15** Plaintiff's failure to exhaust, however, does not end the inquiry. The Second Circuit has held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his administrative remedies.[FN40] First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner."[FN41] Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense."[FN42] Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements."[FN43] Justification "must be determined by looking at the circumstances which might understandably lead ... uncounselled prisoners to fail to grieve in the normally required way." *Giano v. Good,* 380 F.3d 670, 678 (2d Cir.2004). Here, the silence of the regulations regarding which facility was the proper venue for Plaintiff's grievance, the bad advice that Plaintiff received from the officer at Five Points, and Plaintiff's inability to follow that advice because he was shackled during his entire tenure at Elmira create a triable issue of fact that Plaintiff's failure to file a timely grievance regarding Defendant Ham's actions was justified. I therefore find that summary judgment is not appropriate on the grounds that Plaintiff failed to exhaust his administrative remedies.

FN40. *See Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004). The Second Circuit has not yet decided whether the *Hemphill* rule has survived the Supreme Court's decision in *Woodford. Chavis v. Goord,* No. 07-4787-pr, 2009 U.S.App. LEXIS 13681, 2009 WL 1803454, at \*1 (2d Cir. June 25, 2009).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

FN41. *Hemphill,* 380 F.3d at 686 (citation omitted).

FN42. *Id.* (citations omitted).

FN43. *Id.* (citations and internal quotations omitted).

**2.** *"Sufficiently Serious"*

Defendants argue that there is not a triable issue of material fact regarding Plaintiff's Eighth Amendment claim against Defendant Ham because "Plaintiff's alleged 'enormous pain' is nothing more than *de minimis* for Constitutional purposes." (Dkt. No. 92-10 at 22-23.)

Claims that prison officials applied restraints too tightly are analyzed under the Eighth Amendment as claims of excessive force. *See Davidson v. Flynn,* 32 F.3d 27 (2d Cir.1994). When prison officials are "accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is ... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian,* 503 U.S. 1, 6-7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). The extent of any injury suffered by the inmate "is one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Id.* at 7 (citation and quotation marks omitted).

**\*16** In determining whether the use of force was wanton and unnecessary, it may also be proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by responsible officials, and any efforts made to temper the severity of a forceful response. The absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it.

*Id.* (citation and quotation marks omitted). In other words, not "every malevolent touch by a prison guard gives rise to a federal cause of action. The Eighth Amendment's prohibition of cruel and usual punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Id.* at 9 (officers who punched and kicked handcuffed and shackled inmate used unconstitutional force although inmate required no medical attention) (citations omitted); *Davidson,* 32 F.3d at 30 n. 1 (officers who placed handcuffs too tightly on inmate in retaliation for filing lawsuits used unconstitutional force where inmate suffered permanent scarring and numbness); *compare Warren v. Purcell,* No. 03 Civ. 8736, 2004 U.S. Dist. LEXIS 17792, at \*24, 2004 WL 1970642 (S.D.N.Y. Sept.3, 2004) (officers who placed prisoner in tight restraints did not violate constitution where prisoner suffered temporary pain, numbness and swelling and no improper or wanton motive was suggested for the officers' actions).[FN44]

FN44. Defendants served this unpublished case on Plaintiff with their moving papers as required by Local Rule 7.1(a)(1). (Dkt. No. 92-11.)

Plaintiff does not allege that he was permanently injured as a result of Defendant Ham's actions. Plaintiff states that he suffered "enormous pain" and "severe swelling" as a result of being shackled so tightly. (Dkt. No. 109 at 38.) Although this would not end the Eighth Amendment inquiry if Defendant Ham's actions had been more egregious, there is simply no evidence in the record that Defendant Ham applied restraints to Plaintiff "maliciously and sadistically to cause harm" or in a way that was "repugnant to the conscience of mankind." Therefore, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's claims against Defendant Ham.

**3.** *Grievances*

Plaintiff alleges that Defendants Brousseau and Donelli "refused to forward" his complaint regarding

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

Defendant Ham's actions "for an investigation" (Dkt. No. 1 ¶¶ 28-29), thus violating his First Amendment right to petition the government. (Dkt. No. 109 at 50-51.) Defendants argue that Plaintiff's allegation fails to state a constitutional violation. (Dkt. No. 92-10 at 38.) Defendants are correct.

The First Amendment protects a prisoner's right to meaningful access to the courts and to petition the government for the redress of grievances. *See Bill Johnson's Rest., Inc. v. NLRB,* 461 U.S. 731, 741, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983). However, inmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim. *Cancel v. Goord,* No. 00 Civ.2042, 2001 WL 303713, *3 (S.D.N.Y. Mar. 29, 2001). If prison officials ignore a grievance that raises constitutional claims, an inmate can directly petition the government for redress of that claim. *See Flick v. Alba,* 932 F.2d 728, 729 (8th Cir.1991). "Therefore, the refusal to process an inmate's grievance or failure to see to it that grievances are properly processed does not create a claim under § 1983." *Cancel,* 2001 WL 303713, at *3; *see also Torres v. Mazzuca,* 246 F.Supp.2d 334, 342 (S.D.N.Y.2003); *Mahotep v. DeLuca,* 3 F.Supp.2d 385, 390 (W.D.N.Y.1998).

**\*17** *Shell v. Brzezniak,* 365 F.Supp.2d 362, 369-370 (W.D.N.Y.2005). Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss the claims against Defendants Brousseau and Donelli for their handling of Plaintiff's grievance regarding Defendant Ham.

**C. Frisk Room Incident/Aftermath/Grievances**

Plaintiff alleges that he threatened to sue Defendants Nephew, Desotelle, and Snyder if they used force to put on his coat. (Dkt. No. 1 ¶ 15.) Plaintiff alleges that, in retaliation for this threat, (1) Defendant Wright conspired with Defendant Snyder to subject Plaintiff to excessive force; (2) Defendants Duprat, Snyder, and Bogett used excessive force on Plaintiff; (3) Defendants Wright,

Nephew, Desotelle, and Snyder falsified misbehavior reports against Plaintiff; and (4) Defendant Bezio failed to intervene to prevent the use of excessive force.[FN45] (Dkt. No. 1 ¶¶ 16-22.) He further alleges that Defendants Brousseau and Donelli would not allow Plaintiff to file a grievance regarding these events. (Dkt. No. 1 ¶¶ 30-31.) Finally, he alleges that Defendants Girdich and Eagen denied the grievance he filed regarding Defendant Brousseau and Donelli's refusal to process Plaintiff's grievance. (Dkt. No. 1 ¶¶ 32-34.)

FN45. The complaint contains some language that could, very liberally construed, assert a claim against these Defendants for denial of Plaintiff's right of access to the courts on the theory that, at the time of these events, Plaintiff was being transported for a court appearance. Defendants addressed this possible claim in their motion for summary judgment. (Dkt. No. 92-10 at 40-42.) In his opposition to the motion, Plaintiff states that he did not intend to assert a claim for denial of access to the courts. (Dkt. No. 109 at 55.) I have therefore not addressed Defendants' arguments.

*1. Exhaustion of Administrative Remedies*

Defendants argue that Plaintiff failed to exhaust his administrative remedies regarding any of these claims. (Dkt. No. 92-10 at 25-26, 31.) Plaintiff declares that on January 13, 2003, he attempted to submit a grievance to Defendant Brousseau regarding the claims. (P.'s Decl. in Opp'n to Aff. of Karen Bellamy ¶ 26.) Plaintiff declares that Defendant Brousseau "refused to file and process the grievance ... in order to prevent me from suing the officials named in the grievance." *Id.* ¶ 27.

On April 3, 2003, Plaintiff submitted a grievance complaining that Defendant Brousseau had refused to accept his January 13 grievance. (Dkt. No. 92-4, Ex. 8.) Plaintiff requested "[t]hat Ms. Brousseau submit the grievance complaint in question to the IGRC. Alternatively, that I be allowed to resubmit a copy of the grievance complaint in issue to the IGRC before moving for judicial intervention." *Id.* CORC denied the grievance on May 28, 2003, stating that it had "not been presented

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

with sufficient evidence to substantiate any malfeasance" by Defendant Brousseau. *Id.*

As discussed above, Second Circuit precedent holds that a defendant may be equitably estopped from raising the exhaustion defense if he or she engaged in conduct that hindered the plaintiff's ability to pursue his or her administrative remedies. *Ziemba v. Wezner,* 366 F.3d 161, 163-64 (2d Cir.2004). A prison official's refusal to accept or forward a prisoner's grievance is conduct that hinders a plaintiff's ability to pursue administrative remedies. *Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008). Thus, Plaintiff's declaration that Defendant Brousseau refused to accept his grievance raises a triable issue of fact that Defendants are estopped from asserting the exhaustion defense. Therefore, I recommend that the Court reject Defendants' argument that they are entitled to summary judgment as a result of Plaintiff's failure to exhaust his administrative remedies.

2. *Conspiracy*

***18** Defendants move for summary judgment of Plaintiff's conspiracy claim. [FN46] They argue that (a) Plaintiff has not shown that there was any meeting of the minds; and (b) the claim is barred by the intracorporate conspiracy doctrine.[FN47] (Dkt. No. 92-10 at 31-32.)

FN46. Defendants characterize Defendants Wright and Snyder as the only defendants to the conspiracy claim. Read broadly, the complaint also alleges that Defendant Duprat conspired with Defendants Wright and Snyder by calling Snyder "to arrange a beating" of Plaintiff. (Dkt. No. 1 ¶ 21.) I will include Defendant Duprat in my analysis of Plaintiff's conspiracy claim.

FN47. Defendants also argue that to the extent Plaintiff's conspiracy claim is brought under 42 U.S.C. § 1985, he has not shown that Defendants were motivated by any class-based animus. (Dkt. No. 92-10 at 31-32.) In his opposition to Defendants' motion, Plaintiff states that he did not intend to raise a claim under 42 U.S.C. § 1985. (Dkt. No. 109 at 44 n. 15.) Therefore, I have not addressed Defendants' argument regarding class-based animus.

a. *Meeting of the Minds*

Defendants argue that Plaintiff has not provided any factual basis for a finding that Defendants had a "meeting of the minds" as required for a conspiracy claim. (Dkt. No. 92-10 at 31-32.) I find that Plaintiff has raised a triable issue of fact.

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999) (citations omitted).

Plaintiff has raised a genuine issue of material fact as to all of the elements of his § 1983 conspiracy claim. Plaintiff states in his verified complaint that Defendant Wright told him that " '[t]ransportation vans don't have cameras. You're going to learn not to spit ... [at] staff and not threaten us with lawsuits.' " (Dkt. No. 1 ¶ 16.) The next day, Defendant Duprat called Defendant Snyder "to arrange a beating" of Plaintiff. (Dkt. No. 1 ¶ 21.) Defendant Snyder entered the transportation van in which Plaintiff was sitting, said "Wright, my boss, doesn't like [you suing us] and sent this as a reminder," and then punched and slapped Plaintiff until Plaintiff lost consciousness. (Dkt. No. 1 ¶¶ 21-22.) A reasonable jury could, if it found Plaintiff's testimony credible, return a verdict for Plaintiff on his conspiracy claim based on this evidence.

b. *Intracorporate Conspiracy Doctrine*

Defendants argue that Plaintiff's conspiracy claim is barred by the intracorporate conspiracy doctrine. (Dkt. No. 92-10 at 32.) Under that doctrine, employees of a single corporate entity are legally incapable of conspiring together. *Bond v. Board of Educ. of City of New York,* 97-cv-1337, 1999 U.S. Dist. LEXIS 3164, at *5, 1999 WL 151702, at *2 (W.D.N.Y. Mar.17, 1999). "This doctrine

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

applies to public entities and their employees." *Lee v. City of Syracuse,* 603 F.Supp.2d 417, 442 (N.D.N.Y.2009) (citations omitted). Although the Second Circuit has recognized the doctrine in the context of 42 U.S.C. § 1985, *see Herrmann v. Moore,* 576 F.2d 453, 459 (2d Cir.1978); *Girard v. 94th and Fifth Avenue Corp.,* 530 F.2d 66, 72 (2d Cir.1976), it has not extended its application of the doctrine to conspiracy claims under § 1983. Several district courts in the Second Circuit have, however, applied the doctrine to § 1983 cases. [FN48] The district court cases cited in the footnote applied the intracorporate conspiracy doctrine to § 1983 without discussing whether it was appropriate to do so. In *Anemone v. Metropolitan Transportation Authority,* 419 F.Supp.2d 602, 604 (S.D.N.Y.2006), the Southern District squarely held that the intracorporate conspiracy doctrine should be applied to § 1983 cases because "the doctrine's logic is sound" and not "a single case within the Second Circuit [has] held the doctrine inapplicable to Section 1983 claims." I will assume that the doctrine applies in § 1983 cases.

FN48. *See Green v. Greene,* No. 9:07-CV-0351 (GTS/DEP), 2009 U.S. Dist. LEXIS 68186, 2009 WL 2424353 (N.D.N.Y. Aug.5, 2009); *Sebast v. Mahan,* No. 09-cv-98 (GLS/RFT), 2009 U.S. Dist. LEXIS 64712, 2009 WL 2256949, at *3 (N.D.N.Y. July 28, 2009); *Lee v. City of Syracuse,* 603 F.Supp.2d 417 (N.D.N.Y.2009); *Lukowski v. County of Seneca,* No. 08-CV6098, 2009 U.S. Dist. LEXIS 14282, 2009 WL 467075 (W.D.N.Y. Feb.24, 2009); *Perrin v. Canandaigua City School Dist.,* No. 08-CV-61536, 2008 U.S. Dist. LEXIS 95280, 2008 WL 5054241 (W.D.N.Y. Nov.21, 2008); *Rodriguez v. City of New York,* --- F.Supp.2d ----, No. 05-CV-5117, 2008 U.S. Dist. LEXIS 9966, 2008 WL 420015 (E.D.N.Y. Feb.11, 2008); *Crews v. County of Nassau,* No. 06-CV-2610, 2009 U.S. Dist. LEXIS 38354, 2007 WL 4591325 (E.D.N.Y. Dec. 27, 2007); *Little v. City of New York,* 487 F.Supp.2d 426 (S.D.N.Y.2007); *Clark v. City of Oswego,* No. 5:03-CV-202 (NAM/DEP), 2006 U.S. Dist. LEXIS 95769, 2007 WL 925724 (N.D.N.Y. March 26, 2007); *Malone v. City of New York,* No. CV-05-2882, 2006 U.S. Dist. LEXIS 61866, 2006 WL 2524197 (E.D.N.Y. Aug. 30, 2006); *Caidor v. M & T Bank,* No. 5:05-CV-297 (FJS/GJD), 2006 U.S. Dist. LEXIS 22980, 2006 WL 839547 (N.D.N.Y. Mar.27, 2006).

**\*19** Even where the intracorporate conspiracy doctrine applies, there is an exception to the doctrine where "individuals pursue personal interests wholly separate and apart from the entity." *Orafan v. Goord,* 411 F.Supp.2d 153, 165 (N.D.N.Y.2006) (citation and quotation marks omitted), *vacated and remanded on other grounds, Orafan v. Rashid,* No. 06-2951, 249 Fed. Appx. 217 (2d Cir. Sept.28, 2007). I have previously found that a triable issue of fact exists regarding whether officers acted pursuant to their personal interests where a prisoner alleges that officers assaulted him in retaliation for participating in a federal lawsuit. *Medina v. Hunt,* No. 9:05-CV-1460, 2008 U.S. Dist. LEXIS 74205, 2008 WL 4426748 (N.D.N.Y. Sept.25, 2008). Other courts have found that the personal interest exception applies, and thus allowed conspiracy claims to proceed, where it was alleged that officers conspired to cover up their use of excessive force. *Hill v. City of New York,* No.03 CV 1283, 2005 U.S. Dist. LEXIS 38926, 2005 WL 3591719, at *6 (E.D.N.Y. Dec. 30, 2005). I find that the exception applies here because, as in *Medina,* Defendants allegedly conspired to retaliate against Plaintiff for his exercise of his right to access the courts. Therefore, I recommend that the Court deny Defendants' motion for summary judgment of the conspiracy claim against Defendants Wright, Snyder, and Duprat.

3. *Excessive Force*

Defendants move for summary judgment of Plaintiff's excessive force claims. They argue that there is no "objective evidence" that any excessive force was used. (Dkt. No. 92-10 at 33-35.) Specifically, Defendants argue that:

[P]laintiff alleges that ... [D]efendants Snyder, Bogett, and Duprat punched him, slapped him, knocked him unconscious, and caused his ear to bleed. There is no

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

objective evidence to support this conclusory allegation. An unusual incident report was generated because of [P]laintiff's behavior on January 3, 2003, but the report specifically states that no force was used on [P]laintiff. To the extent [P]laintiff is claiming the alleged force was used in the van, after the incidents described in the unusual incident report, there is no objective evidence to support this conclusion either. Plaintiff's medical records for January 3, 2003, upon arrival at Five Points C.F. indicate "arrived via van with cuffs & chains and spit net-complains of pain and itching," that [P]laintiff was escorted to 12 building, and that [P]laintiff was given Naprosyn and Benadryl. There is no indication of bleeding, or that [P]laintiff reported being assaulted in the January 3, 2003 entry, or the entries for January 4, 5, and 6, 2003. Plaintiff does report being "knocked-out and beaten everywhere" on January 7, 2003, while still at Five Points C.F., but without any record of reporting this type of conduct for the four (4) days prior to January 7, 2003, it is not credible that the incident to which [P]laintiff is referring occurred on January 3, 2003. Moreover, the January 7, 2003, entry does not indicate whether [P]laintiff was claiming to have been "knocked out and beaten everywhere" by staff or other inmates. Plaintiff has no objective evidence to support his claim of excessive force.

*20 (Id. at 34-35, citations omitted.)

Defendants refer to Plaintiff's allegations as "conclusory." "Conclusory" means to "express[ ] a factual inference without stating the underlying facts on which the inference is based." *Black's Law Dictionary* 284 (7th ed.1999). Plaintiff's allegations are not conclusory. Rather, Plaintiff describes the incident in detail. The ultimate determination of whether or not Defendants used excessive force, then, will rest largely on the finder of fact's judgment regarding Plaintiff's credibility.

Defendants, naturally, do not find Plaintiff credible. In general, of course, "[c]redibility determinations ... are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *See also Rule v. Brine, Inc.,* 85 F.3d

1002, 1011 (2d Cir.1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."). Although Defendants do not explicitly say so, their argument that "Plaintiff has no *objective* evidence" is apparently an attempt to invoke a "narrow exception" to the general rule that credibility determinations are not to be made on summary judgment. *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005); *Blake v. Race,* 487 F.Supp.2d 187, 202 (E.D.N.Y.2007). In *Jeffreys,* the Second Circuit held that in the "rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete," the court may appropriately conclude at the summary judgment stage that no reasonable jury would credit the plaintiff's testimony. *Jeffreys,* 426 F.3d at 554.

The narrow holding of *Jeffreys* is not applicable here for three reasons. First, in order for the *Jeffreys* exception to apply, the plaintiff must rely "almost exclusively on his own testimony." *Jeffreys,* 426 F.3d at 554. Here, Plaintiff is not relying "almost exclusively on his own testimony." Rather, because of Defendants' conduct during discovery, Plaintiff is relying on his own testimony plus adverse inferences drawn in his favor. As a consequence of Defendants' conduct during discovery, I ordered that Plaintiff could "ask the Court to draw factual inferences favorable to him based upon the missing photographs of January 3 and 10, 2003." (Dkt. No. 107 at 2.) Plaintiff requests that the Court draw the following inference in his favor: "That were the Defendants to provide the Court with the missing photographs taken of [Plaintiff] at Five Points C.F. on January 3, 2003, such photographs would reveal that [Plaintiff] had bruises and lacerations on his face, right ear, and chest." (Dkt. No. 109 at 46-47 n. 15.) The Court grants Plaintiff's request and draws the inference in his favor.

Second, in order for the *Jeffreys* exception to apply, Plaintiff's testimony must be "contradictory or incomplete." *Jeffreys,* 426 F.3d at 554. Here, Plaintiff's testimony is neither contradictory nor incomplete. In *Jeffreys,* the plaintiff, who alleged that police officers had

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

beaten and defenestrated him, confessed on at least three occasions that he had jumped out of a third-story window rather than having been thrown. *Id.* at 552. The plaintiff did not publicly state that he had been thrown out of a window by police officers until *nine months* after the incident. *Id.* The plaintiff could not identify any of the individuals whom he alleged participated in the attack or describe their ethnicities, physical features, facial hair, weight, or clothing on the night in question. *Id.* Here, in contrast, Plaintiff has never given a contradictory account of the events in the transportation van on January 3, 2003. Although Defendants stress that Plaintiff's medical records do not show that Plaintiff reported the incident upon arrival at Five Points, Plaintiff states in his verified complaint that he informed Defendant Hensel on the day of the incident that he had been beaten by Upstate guards. He further alleges that Defendant Hensel made no record of his complaint. (Dkt. No. 1 ¶ 23.) Plaintiff's claim regarding Nurse Hensel is corroborated by the log book entry that shows that he was taken to see Nurse Hensel on January 3, 2003, and the fact that Defendants did not provide the Court with a medical record of that visit with Plaintiff's other Five Points Medical Records. (Defs.' Resp. to P's 1st Req. for Produc. of Docs., Ex. E at 11; Bannister Aff.) As Defendants admit, Plaintiff's medical records show that within four days of the incident he reported that he had been "knocked-out and beaten everywhere." (Bannister Aff. ¶ 10.) In addition, unlike in *Jeffreys,* Plaintiff has specifically identified the officers whom he alleges beat him.

**\*21** Third, the *Jeffreys* exception is most applicable where the plaintiff's version of events is contradicted by defense testimony. In *Jeffreys,* for instance, one of the arresting officers declared that, contrary to the plaintiff's version of events, he was the only officer who entered the room where the plaintiff was allegedly beaten and that he saw the plaintiff jump out the open window. *Jeffreys,* 426 F.3d at 551-52. Here, Plaintiff's version of events has not been contradicted by an affidavit from any of the officers whom he alleges used excessive force because Defendants' motion for summary judgment is not supported by any affidavit from Defendants Snyder, Duprat, or Bogett. The only proof offered by Defendants that they did *not* use

excessive force is a notation on a January 3, 2003, unusual incident report stating "Use of Force: No." (Dkt. No. 92-5, Ex. 16.)

Accordingly, I find that Plaintiff has presented sufficient "objective evidence" to raise a triable issue of fact that Defendants Snyder, Duprat, and Bogett subjected him to excessive force.[FN49] I therefore recommend that the Court deny Defendants' motion for summary judgment of this claim.

> FN49. Read broadly, the complaint also asserts an excessive force claim against Wright and retaliation claims against Defendants Snyder, Duprat, Bogett, and Wright. Defendants have not addressed these potential claims. I find that the claims are sufficient to withstand *sua sponte* review under 28 U.S.C. § 1915(e)(2)(B).

4. *False Misbehavior Reports*

Plaintiff alleges that Defendants Nephew, Desotelle, Snyder, and Wright filed false misbehavior reports against him "in retaliation for his having threatened to sue them." (Dkt. No. 1 ¶¶ 17-18.) Defendants argue that (a) Plaintiff forfeited his claim by refusing to attend the disciplinary hearing on the charges; and (b) they would have issued the misbehavior reports regardless of any alleged retaliatory motive. (Dkt. No. 92-10 at 25-29.)

a. *Forfeiture*

Defendants argue that Plaintiff "cannot establish a prima facie case of retaliation, because although he claims the misbehavior report[s were] 'falsified,' he has forfeited his opportunity to present any evidence calling into question the truth of the misbehavior report[s] by refusing to attend the disciplinary hearing." (Dkt. No. 92-10 at 26.) Defendants cite *Brewer v. Kamas,* 533 F.Supp.2d 318 (W.D.N.Y.2008). In order to analyze *Brewer,* a review of Second Circuit precedent governing prisoners' allegations regarding false misbehavior reports is required.

A prisoner's claim that a correctional officer filed a false misbehavior report may implicate two separate constitutional provisions: (a) the Fourteenth Amendment

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

right to procedural due process; or (b) the right not to be retaliated against for exercising First Amendment rights such as the right of access to the courts or the right to petition the government for redress of grievances.

In the procedural due process context, the Second Circuit has held that while a prisoner "has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest," he *does* have "the right not to be deprived of a protected liberty interest without due process of law." *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). Where a prisoner is falsely accused of violating disciplinary rules, and a hearing is held on the allegedly false charges that comports with the procedural due process standards set forth by the Supreme Court in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), and any resulting guilty finding is based on "some evidence," the correctional officer's filing of unfounded charges does not give rise to procedural process liability. *Freeman,* 808 F.2d at 953-54.

**\*22** Two years after its *Freeman* opinion, the Second Circuit addressed the second variety of false misbehavior claim-a claim that an officer filed a false misbehavior report in retaliation for the exercise of constitutionally protected rights-in *Franco v. Kelly,* 854 F.2d 584 (2d Cir.1988). In *Franco,* a prisoner alleged that correction officers filed a false misbehavior report against him in retaliation for his cooperation with an investigation by the state Inspector General into incidents of inmate abuse at Attica Correctional Facility. *Franco,* 854 F.2d at 586. The defendants moved for summary judgment, arguing that Plaintiff could not state a claim because he had received a disciplinary hearing that complied with *Wolff v. McDonnell* and resulted in a guilty finding based on "some evidence." *Id.* The trial court granted the defendants' motion, relying on *Freeman. Id.* The trial court noted, however, "that under [t]his reading of *Freeman,* the mere provision of procedural due process could eliminate all liability in any case in which prison officials had intentionally filed false and unfounded charges." *Id.* The Second Circuit settled "the substantial and troublesome questions raised in th[e] case" by holding

that "[a]lthough our decision in *Freeman* accords prison officials wide latitude in disciplining inmates as long as minimum constitutional procedures are employed, that latitude does not encompass conduct that infringes on an inmate's substantive constitutional rights" such as the prisoner's First Amendment rights of access to the courts and to petition for redress of grievances. *Id.* at 590 (citations omitted). Accordingly, the Second Circuit reversed the trial court's judgment and remanded the matter for further proceedings. *Id.* at 590-91.

In *Jones v. Coughlin,* 45 F.3d 677 (2d Cir.1995), the Second Circuit again clarified that the holding in *Freeman* is doctrinally different and distinct from the type of retaliation claim discussed in *Franco.* In *Jones,* a prisoner alleged that correction officers filed a false misbehavior report against him in retaliation for filing an administrative complaint against one of their colleagues. *Jones,* 45 F.3d at 678. At his disciplinary hearing, the prisoner was denied the opportunity to call witnesses. *Id.* He was found guilty and sentenced to serve 120 days in the SHU. *Id.* After he had served his SHU sentence, DOCS official Donald Selsky reversed the decision and expunged it from the prisoner's record. *Id.* at 679. The prisoner filed suit. *Id.* The trial court granted the prison officials' motion for summary judgment, finding that the prisoner's allegations against the corrections officers failed to state a claim under *Freeman* and that the prisoner's allegations against the hearing officer failed because any procedural due process defects in the hearing had been cured by Selsky's reversal of the decision. *Id.*

**\*23** On appeal, the Second Circuit stated that *Freeman* did not provide the "proper framework" for a decision in the case for both "factual and doctrinal reasons." *Jones,* 45 F.3d at 679. Factually, the case was distinguishable "if, as alleged, Jones was unfairly denied the right to call key witnesses in defense of the charges against him." *Id.* Doctrinally, the Second Circuit stated that "we have held that a prisoner has a substantive due process right not to be subjected to false misconduct charges as retaliation for his exercise of a constitutional right such as petitioning the government for redress of his grievances, and that this right is distinct from the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

procedural due process claim at issue in *Freeman." Id.* at 679-80. The Second Circuit vacated the trial court's judgment and remanded for further proceedings. *Id.* at 680.

This brings us to *Brewer*. In *Brewer,* a prisoner alleged that correction officers filed false misbehavior reports against him in retaliation for filing grievances. *Brewer,* 533 F.Supp.2d at 323. The prisoner refused to attend his disciplinary hearing and was found guilty. *Id.* He sued the officers in federal court. *Id.* at 324. The officers moved for summary judgment. *Id.* The court granted the motion, finding that the prisoner could not establish that the disciplinary charges were false because (1) he refused to attend his disciplinary hearing; (2) he offered no "explanation as to why he chose not to attend the hearing so as to rebut the charges, or why it was otherwise constitutionally deficient"; and (3) he did not "offer ..., in opposition to [d]efendants' motion, any evidence calling into question the truth of the ... charges." *Id.* at 330. (citation omitted). Based on these three factors, the court stated that the plaintiff "was provided with the requisite opportunity to rebut the alleged false disciplinary charges, as required by due process, and Plaintiff, by failing to do so, has waived his right to further challenge the validity" of the misbehavior report. *Id.* (citation omitted).

*Brewer* is not applicable here for three reasons. First, the case is factually distinguishable. In *Brewer,* the prisoner did not offer any explanation for his refusal to attend the hearing, did not explain why the hearing was constitutionally deficient, and did not offer any evidence calling into question the truth of the charges. *Brewer,* 533 F.Supp.2d at 330. Here, Plaintiff has explained that he did not attend the hearing because Defendant LaClair refused to assist him prepare a defense, has argued that the hearing was constitutionally deficient because Defendant Bullis did not call Defendant LaClair and an inmate as witnesses, and has offered his own testimony under penalty of perjury to rebut Defendants' version of the events leading to the misbehavior reports.

Second, Defendants overstate the holding of *Brewer.*

The court did not hold that the prisoner had forfeited his opportunity to present evidence calling into question the truth of the misbehavior report simply by refusing to attend the disciplinary hearing. Rather, the court held that the prisoner had waived his right for three reasons, with the refusal to attend being only one of them. *Brewer,* 533 F.Supp.2d at 330.

**\*24** Third, because the prisoner in *Brewer* asserted a retaliation claim rather than a procedural due process claim, the precedent relied upon by the *Brewer* court is puzzling. The portion of the decision cited at length by Defendants relies on (1) *Freeman,* which is a procedural due process case; (2) language from *Jones* that discusses the ways in which *Jones* was *factually* distinguishable from *Freeman,* rather than the language in *Jones* clarifying that a retaliation claim is *doctrinally* different from the type of procedural due process claim at issue in *Freeman;* and (3) quotes from *Franco* that summarize the procedural due process holding in *Freeman,* rather than quotes from *Franco* discussing the proper analysis of a retaliation claim. Thus, although the prisoner in *Brewer* raised a retaliation claim, the court analyzed it as a procedural due process claim.

Because I find that *Brewer* is factually distinguishable from Plaintiff's case, that the holding in *Brewer* is not as broad as Defendants suggest, and that *Brewer's* legal analysis rests on a line of cases to which the Second Circuit has referred as the improper framework for analyzing a retaliation claim, I recommend that the Court reject Defendants' argument that Plaintiff waived his claim regarding the allegedly false and retaliatory misbehavior reports by failing to appear at his disciplinary hearing.[FN50]

> FN50. I note that *Howard v. Wilkerson,* 768 F.Supp. 1002 (S.D.N.Y.1991) holds that "[a]n inmate's refusal to attend a disciplinary hearing waives his *due process objections* ... only when it occurs through no fault of prison officials." *Howard,* 768 F.Supp. at 1006 (citation and quotation marks omitted) (emphasis added). *Howard* is cited in *Nance v. Villafranca,* No. 91-CV-717, 1994 U.S. Dist. LEXIS 11114

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

(N.D.N.Y. June 20, 1994), which Defendants cite for a different proposition. (Dkt. No. 92-10 at 39.)

b. *Regardless of retaliatory motive*

Defendants argue that there is "ample evidence" that Defendants "would have issued the misbehavior report[s] regardless of whether [P]laintiff threatened to sue them." (Dkt. No. 92-10 at 28, 30.) "An allegation that a prison official filed false disciplinary charges in retaliation for the exercise of a constitutionally protected right ... states a claim under § 1983. A plaintiff alleging retaliatory punishment bears the burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff. The burden then shifts to the defendant to show that the plaintiff would have received the same punishment even absent the retaliatory motivation. The defendant can meet this burden by demonstrating that there is no dispute that the plaintiff committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report." *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir.2002) (citations and quotation marks omitted).

Here, the misbehavior reports by Defendants Nephew, Desotelle, and Snyder charged Plaintiff with creating a disturbance, committing an unhygenic act, refusing a direct order, and making threats. (Dkt. No. 92-5, Ex. 11.) As the Second Circuit explained in *Hynes v. Squillace*, 143 F.3d 653 (2d Cir.1998), the "most serious charge" in a misbehavior report that includes charges of creating a disturbance, making threats, and refusing a direct order is the direct order charge. *Hynes*, 143 F.3d at 655, 657. Here, Plaintiff admits that he did not put on his coat when Defendant Nephew ordered him to do so. (Dkt. No. 1 ¶ 15.) Thus, Defendants have met their burden of showing that Plaintiff would have received the same punishment even absent the allegedly retaliatory motive by demonstrating that there is no dispute that Plaintiff committed the most serious of the prohibited conduct charged in the misbehavior report. Therefore, I

recommend that the Court grant Defendants' motion for summary judgment and dismiss the retaliation claims against Defendants Nephew, Desotelle, and Snyder arising from the January 2, 2003, misbehavior reports.

**\*25** The misbehavior report by Defendant Wright charged Plaintiff with committing an unhygenic act, harassment, and threats.[FN51] (Dkt. No. 92-5, Ex. 11.) The most serious of these charges was the threat charge.

> FN51. Although Defendants assert that Wright charged Plaintiff with disobeying a direct order, the evidence before the court does not support that assertion. (Dkt. No. 92-5, Exs.11-12.)

Plaintiff admits that when Defendant Wright asked him to explain what happened in the frisk room, Plaintiff "responded that Wright would not believe his account of the incident, that Wright had unjustifiably interfered with [his] court trip ... and that [Plaintiff] would sue Wright and Snyder for their unlawful acts and actions." (Dkt. No. 1 ¶ 16.) This is certainly an admission to the harassment charge. DOCS Rule 107.11 provides as follows: "An inmate shall not harass an employee or any other person verbally or in writing. Prohibited conduct includes, but is not limited to, using insolent, abusive, or obscene language or gestures." N.Y. Comp.Codes R. & Regs., tit. 7, § 270.2(B)(8)(ii). However, it is not an admission to the threat charge, which requires that "[i]nmate[s] shall not ... make any threat, spoken, in writing, or by gesture." N.Y. Comp.Codes R. & Regs., tit. 7, § 270.2(B) (3)(I). Therefore, I recommend that the Court deny Defendants' motion for summary judgment regarding the retaliation claim against Defendant Wright.

5. *Failure to Intervene*

Plaintiff alleges that Defendant Bezio violated his constitutional rights by failing to intervene to protect Plaintiff from Defendants Duprat, Bogett, and Snyder. (Dkt. No. 1 ¶¶ 19-20.) Defendants move for summary judgment, arguing that there was no underlying constitutional violation with which to intervene. (Dkt. No. 92-10 at 36-37.)

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

Law enforcement officials can be held liable under § 1983 for not intervening in a situation where another officer is violating an inmate's constitutional rights. *Jean-Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008) (citation omitted). A state actor may be held liable for failing to prevent another state actor from committing a constitutional violation if "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Id.* (citation omitted); *see also Ricciuti v. N.Y.C. Transit Auth.,* 124 F.3d 123, 129 (2d Cir.1997) ("Failure to intercede to prevent an unlawful arrest can be grounds for § 1983 liability."). Whether an officer can be held liable on a failure to intervene theory is generally a question of fact for the jury to decide. *See Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994) ("Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.").

Here, a jury could determine that Defendant Bezio failed to intervene to protect Plaintiff. Plaintiff's verified complaint states that on the day before the incident he asked Defendant Bezio to protect him while he was being transported to court. (Dkt. No. 1 ¶ 19.) Plaintiff alleges that Defendant Duprat made a threatening comment as he escorted Plaintiff to the transportation van and that Plaintiff informed Defendant Bezio of the threat before they reached the van. (Dkt. No. 1 ¶ 20.) Defendant Bezio merely shrugged his shoulders. *Id.* None of the defendants has filed an affidavit contradicting Plaintiff's version of events. As discussed above, there is a triable issue of fact that a constitutional violation occurred with which Defendant Bezio could have intervened. Therefore, I recommend that the Court deny Defendants' motion for summary judgment regarding the failure to intervene claim against Defendant Bezio.[FN52]

FN52. Read broadly, the complaint asserts a retaliation claim against Defendant Bezio based

on these same events and a failure to intervene claim against Defendant Duprat because he was present when Defendant Snyder initially beat Plaintiff. (Dkt. No. 1 ¶ 21.) Defendants have not moved for summary judgment of these claims. I find that these claims are sufficient to withstand *sua sponte* review under 28 U.S.C. § 1915(e)(2)(B).

6. *Grievances*

**\*26** Plaintiff alleges that Defendants Brousseau, Donelli, Girdich, and Eagen violated his constitutional rights by refusing to allow him to file a grievance regarding the events of January 2 and 3, 2003. (Dkt. No. 1 ¶¶ 30-34.) Defendants move for summary judgment, arguing that Plaintiff has not stated a constitutional claim. (Dkt. No. 92-10 at 38.) As discussed above in Section III(B)(3), Defendants are correct. Therefore, I recommend that the Court grant Defendants' motion and dismiss the claims against Defendants Brousseau, Donelli, Girdich, and Eagen regarding the handling of Plaintiff's grievances.

**D. Disciplinary Hearing/Sentence**

Plaintiff raises several claims regarding the conduct of his disciplinary hearing, his disciplinary sentence, and his appeal of the sentence. Specifically, he claims that (1) Defendant LaClair violated his right to due process by falsifying a misbehavior report against Plaintiff to avoid serving as Plaintiff's pre-hearing assistant (Dkt. No. 1 ¶ 35); (2) Defendant Bullis violated his due process rights by failing to call an inmate and Defendant LaClair as witnesses (Dkt. No. 1 ¶¶ 36-37); (3) Defendant Bullis violated his Eighth Amendment rights by sentencing him to a 21-day loaf diet (Dkt. No. 1 ¶ 36-37) and Defendants Weissman and Girdich violated his Eighth Amendment rights by approving the loaf diet (Dkt. No. 1 ¶ 38); and (4) Defendant Selsky violated Plaintiff's right to due process by affirming Defendant Bullis' disposition (Dkt. No. 1 ¶ 40).

1. *LaClair*

Plaintiff alleges that Defendant LaClair falsified a misbehavior report against him in order to avoid serving

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

as Plaintiff's pre-hearing assistant "and for the purpose of depriving Benitez of due process." <sup>FN53</sup> (Dkt. No. 1 ¶ 35.)

FN53. The only version of the events between Defendant LaClair and Plaintiff in evidence before the Court is Defendant LaClair's misbehavior report. According to that report, when Defendant LaClair went to Plaintiff's cell to assist him, Plaintiff "stated ... that [LaClair] was to get [him] what he wanted." Defendant LaClair "informed him that what he needed had to be pertained (sic) to the misbehavior report. [Plaintiff] then stated "Get what I want or I'll fuck you up." Defendant LaClair "informed him the interview was over and left the area." (Dkt. No. 92-5, Ex. 15 at 2-3.) Although Plaintiff states in his verified complaint that Defendant LaClair "intentionally and maliciously falsified" the report, he does not offer any other version of what happened. (Dkt. No. 1 ¶ 35.) He alleges that he asked Defendant Bullis to "interview inmate Rolan and LaClair regarding the acts and actions of LaClair that caused him not to provide Benitez pre-hearing assistance," but he does not provide any information about what those interviews might have revealed. (Dkt. No. 1 ¶ 36.) Due to Defendants' failure to provide Plaintiff with pages of the SHU log book for January 14, 2003, Plaintiff asks the Court to draw an adverse inference that "were Defendants to provide the Court with the missing pages of the ... log book ... such pages would not support any of the allegations of misconduct set out in the misbehavior report that LaClair filed against Benitez on that date." (Dkt. No. 109 at 41 n. 14.) Plaintiff does not explain, however, why such an inference is logical.

In order to state a claim for violation of his procedural due process rights, a plaintiff must allege facts plausibly suggesting that he was deprived of a liberty interest without due process of law. *Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir.2000).

Punishment implicates a protected liberty interest where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular punishment; and (2) the punishment imposes "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 483-84, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *Tellier,* 280 F.3d at 80; *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

Here, no liberty interest is implicated. As a result of being found guilty of the disciplinary charges, Plaintiff was sentenced to a loaf diet. The Second Circuit has held that the imposition of a loaf diet does not impose an atypical and significant hardship on inmates, even where the inmate alleges that the diet caused severe stomach pain and weight loss. *McEachin v. McGuinnis,* 357 F.3d 197 (2d Cir.2004). Therefore, I recommend that the Court dismiss Plaintiff's due process claim against Defendant LaClair.<sup>FN54</sup>

FN54. Although Defendants argue, in regard to Plaintiff's other claims regarding his disciplinary hearing, that due process was not required because no liberty interest was implicated by the imposition of the loaf diet, they did not assert that argument regarding the claim against Defendant LaClair. Rather, Defendants argue that Plaintiff waived Defendant LaClair's assistance by threatening him. (Dkt. No. 92-10 at 38-39.) Due process requires that prison officials provide pre-hearing assistance to a prisoner facing disciplinary charges who is confined to the SHU. *Eng v. Coughlin,* 858 F.2d 889 (2d Cir.1988). "An assistant's role is to act as merely a surrogate for the inmate, not a legal advisor or advocate. [A]n assistant's role is to perform tasks like interviewing witnesses that the inmate would perform himself if her were in the general population." *Jackson v. Johnson,* 30 F.Supp.2d 613, 619 (S.D.N.Y.1998) (citations and punctuation omitted). The assistance "must be provided in good faith and in the best interests of the inmate." *Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998) (citation omitted). An "assigned

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

assistant who does nothing to assist a ... prisoner ... has failed to accord the prisoner his limited constitutional due process right of assistance." *Eng,* 858 F.2d at 898. Defendants cite several cases holding that an inmate may waive his right to assistance by remaining silent when assistance is offered or by refusing to sign a form requesting assistance. (Dkt. No. 92-10 at 39, citing *inter alia, Jackson,* 30 F.Supp.2d at 619.) However, Defendants have not cited any cases holding that an inmate waives his right to assistance by threatening his assistant. In light of my finding that Plaintiff was not deprived of a liberty interest, it is not necessary to reach this issue.

2. *Failure to Call Witnesses*

**\*27** Plaintiff alleges that Defendant Bullis violated his right to due process by failing to call the witnesses that Plaintiff requested. (Dkt. No. 1 ¶ 37.) Defendants move for summary judgment, arguing that Plaintiff cannot state a due process claim because he was not deprived of a liberty interest. (Dkt. No. 92-10 at 39-40.) As discussed above, Defendants are correct. *McEachin,* 357 F.2d at 200. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss this claim.

3. *Imposition of Loaf Diet*

Plaintiff alleges that Defendant Bullis violated his Eighth Amendment rights by imposing the loaf diet on him and that Defendants Weissman and Girdich violated his Eighth Amendment rights by approving the punishment. (Dkt. No. 1 ¶¶ 37-38.) Defendants move for summary judgment of the claim, arguing that (a) Plaintiff failed to exhaust his administrative remedies; and (b) Defendants were not deliberately indifferent. (Dkt. No. 92-10 at 14-20.)

a. *Exhaustion of Administrative Remedies*

Defendants argue that Plaintiff did not exhaust his administrative remedies regarding his Eighth Amendment claims against Defendant Bullis because he did not appeal

the grievance he filed regarding Defendant Bullis' imposition of the loaf diet to the CORC. (Dkt. No. 92-10 at 14.) Defendants argue that Plaintiff failed to exhaust his administrative remedies regarding his Eighth Amendment claim against Defendants Weissman and Girdich because he did not file a grievance at all. (*Id.* at 15.)

DOCS has a separate and distinct administrative process for inmates to appeal the result of disciplinary hearings, which is not referred to as a "grievance" process. N.Y. Comp.Codes R. & Regs. tit.7, § 701.3(e)(1)-(2). For Tier III superintendent hearings, such as Plaintiff's, the inmate must file an appeal with Donald Selsky, DOCS Director of Special Housing/Inmate Disciplinary Program, pursuant to New York Compilation of Codes, Rules and Regulations, title 7, section 254.8. The appeal must be filed within 30 days of the inmate's receipt of the hearing officer's written disposition. N.Y. Comp.Codes R. & Regs. tit.7, § 254.8. Plaintiff raised the issue of the loaf diet in his appeal of the disciplinary sentence. (P.'s Decl. in Opp'n to Aff. of Karen Bellamy, Ex. D.) Defendant Selsky denied the appeal. *Id.* at Ex. E. Therefore, Plaintiff exhausted his administrative remedies as to his claim against Defendant Bullis.

Plaintiff declares that on January 18, 2003, he submitted a grievance to Defendant Brousseau complaining about Defendant Bullis' imposition of, and Defendants Weissman and Girdich's approval of, the loaf diet. (P.'s Decl. in Opp'n to Aff. of Karen Bellamy, ¶ 26.) He declares that Defendant Brousseau "deliberately refused to file and process the grievance ... in order to prevent me from suing the officials named in the grievance." *Id.* ¶ 27. Therefore, as discussed above, there is a question of fact that Defendants are estopped from asserting the exhaustion defense.

b. *Deliberate Indifference*

**\*28** Defendants argue that Plaintiff has not raised a triable issue of fact that Defendants Bullis, Weissman, and Girdich acted with deliberate indifference when they ordered and approved that the loaf diet be imposed on Plaintiff. (Dkt. No. 92-10 at 15-20.) Defendants are correct.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

Where a prisoner claims that punishment imposed following a disciplinary hearing violates his Eighth Amendment rights, the proper analysis of the subjective prong of the claim requires the court to "consider whether the [o]rder was reasonably calculated to restore prison discipline and security and, in that ... context, whether the officials were deliberately indifferent to [the prisoner's] health and safety." *Trammell v. Keane,* 338 F.3d 155, 163 (2d Cir.2003).

Here, the order imposing the loaf diet on Plaintiff was reasonably calculated to restore prison discipline and security. DOCS regulation allow the imposition of the loaf diet as punishment where, *inter alia,* the inmate is found guilty of committing unhygenic acts in the SHU or the inmate is a long-term SHU inmate who is disruptive and who has lost all other available privileges. (Dkt. No. 92-8, Bezio Aff., ¶ 5.) Here, Plaintiff was found guilty of committing unhygenic acts in the SHU. Moreover, Plaintiff is a long-term SHU inmate (he will remain in the SHU until June 3, 2021, and in keeplock until July 1, 2025) who has lost package, commissary, and phone privileges and has lost 11 years of good time credits. (Bezio Aff., ¶ 6.) Therefore, the imposition of the loaf diet was reasonably calculated to restore prison discipline.

There is no evidence that Defendants Bullis, Weissman, and Girdich acted with deliberate indifference when they imposed and approved the loaf diet. To establish deliberate indifference, an inmate must prove that (1) the defendant was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the defendant actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,* 143 F.3d at 702-703. Here, although Plaintiff told Defendant Bullis that the loaf diet would cause him severe abdominal pains and constipation due to his hepatitis (Dkt. No. 1 ¶ 36), his medical record did not support his assertion. Dr. Weissman declares that "there is nothing in his medical record that indicates that [Plaintiff] is medically unable to receive the restricted diet penalty ... [T]he fact that [P]laintiff is Hepatitis C positive does not mean he cannot receive the restricted diet because Hepatitis C is not a

contraindication for the restricted diet." (Weissman Aff. ¶¶ 14-15.) Thus, there is no evidence in the record indicating that Defendants Bullis, Weissman, and Girdich were aware of facts from which the inference could be drawn that the loaf diet would harm Plaintiff or that they drew that inference. Moreover, Plaintiff admits that he refused to eat the loaf diet. (Dkt. No. 1 ¶ 39.) Accordingly, any weight loss and pain that he experienced could not have resulted from the loaf diet itself. Accordingly, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's Eighth Amendment claims against Defendants Bullis, Weissman, and Girdich.

4. *Selsky*

**\*29** Plaintiff alleges that Defendant Selsky affirmed Defendant Bullis' "disciplinary determination, even though he knew or should have known that Bullis violated [Plaintiff]'s clearly established due process rights." (Dkt. No. 1 ¶ 40.) Defendants' motion for summary judgment does not directly address this claim. However, I find that it is subject to *sua sponte* dismissal pursuant to 28 U.S.C. § 1915(e)(2)(B) because, as discussed above, Defendant Bullis did not violate Plaintiff's due process rights. Therefore, I recommend that the Court dismiss the claim against Defendant Selsky.

**E. Five Points Health Care**

Plaintiff alleges that Defendants Hensel, Goodwin, Kuhlman, and Costello violated his Eighth Amendment rights by failing to provide adequate medical care at Five Points Correctional Facility following the alleged beating by Defendants Snyder, Duprat, and Bogett. (Dkt. No. 1 ¶¶ 23-26.) Defendants move for summary judgment, arguing that (1) Plaintiff failed to serve Defendant Kuhlman; and (2) Plaintiff cannot raise a triable issue of fact that these Defendants violated his Eighth Amendment rights because Plaintiff did not suffer from a serious medical need and Defendants were not deliberately indifferent. (Dkt. No. 92-10 at 6, 20.)

1. *Failure to Serve Defendant Kuhlman*

Defendants argue that the claim against Defendant Kuhlman must be dismissed because she was not served

within 120 days of the filing of the amended complaint on October 6, 2004. (Dkt. No. 92-10 at 6.) Under the Federal Rules of Civil Procedure, a defendant must be served with the summons and complaint within 120 days [FN55] after the filing of the complaint. Fed.R.Civ.P. 4(m). The court "must" extend the time for service for an appropriate period if the plaintiff shows good cause for the failure to serve. *Id.*

> FN55. This 120-day service period is shortened, or "expedited," by the Court's Local Rules of Practice (and the Court's General Order 25), which provide that all defendants must be served with the summons and complaint within sixty (60) days of the filing of the complaint. N.D.N.Y. L.R. 4.1(b) (emphasis added).

Here, on June 24, 2005, the summons was returned unexecuted as to Defendant "Coleman." (Dkt. No. 21.) On May 22, 2007, the Clerk's office sent Plaintiff a letter informing him that the Marshals Service had not been able to serve the defendant because there was no one by that name at Five Points Correctional Facility. The Clerk's office provided Plaintiff with another USM-285 form and asked for more information about the defendant. (Dkt. No. 54.) Plaintiff states that he was not able to ascertain Defendant Kuhlman's correct identity until after I issued orders on May 2, 2007, and October 3, 2007, compelling defendants to respond to discovery. (Dkt. No. 109 at 7-8.) The docket shows that on January 31, 2008, Plaintiff attempted to file an amended complaint "correctly identif[ying] defendant Kulhman by substituting the name 'Coleman' ... for 'Kuhlman.' " (Dkt. No. 74.) On February 4, 2008, I ordered Plaintiff's motion stricken from the record because the deadline for filing motions to amend had expired on January 30, 2006. (Dkt. No. 75.) I find, therefore, that Plaintiff has demonstrated good cause for his failure to serve Nurse Kuhlman.

2. *Merits*

***30** Plaintiff claims that Defendants Hensel, Goodwin, Kuhlman, and Costello violated his Eighth Amendment rights by refusing to treat him for head pain, pain in his liver, pain in his left wrist, and severe body itch. Plaintiff also alleges that he informed Defendant Hensel that "he had ... lost blood from within his right ear." (Dkt. No. 1 ¶¶ 23-26.) Defendants argue that Plaintiff has not raised a triable issue of fact as to either the objective or subjective prong of his Eighth Amendment medical care claim. (Dkt. No. 92-10 at 20.)

As discussed above, the objective prong of an Eighth Amendment medical claim requires the court to determine whether the prisoner was deprived of adequate medical care and, if so, whether the inadequacy was sufficiently serious. *Salahuddin,* 467 F.3d at 279-80. Where the prisoner alleges that he was completely deprived of treatment, the court must examine whether the inmate's medical condition is sufficiently serious. *Id.* at 280. Here, because Plaintiff alleges that he was totally deprived of medical care, I must consider whether the bleeding in his inner right ear, head pain, pain in his liver, pain in his left wrist, and severe body itch are "serious medical conditions," in other words, whether they are conditions "of urgency that may produce death, degeneration, or extreme pain." *Id.; Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting).

Defendants argue, without analysis, that none of Plaintiff's "conditions constitute a condition of urgency, one that may produce death, degeneration, or extreme pain." (Dkt. No. 92-10 at 20.) As discussed above in regard to Plaintiff's claims against Defendant Weissman and Richardson, I agree that Plaintiff's severe body itch is not a serious medical condition. However, Plaintiff's bleeding inner ear, head pain, and liver pain, as alleged, appear urgent and capable of producing extreme pain. *See Bjorkstrand v. DuBose,* No. CIV. S-08-1531, 2008 WL 5386637, at * 3 (E.D.Cal. Dec.24, 2008) (finding that dried blood in ear was not a serious medical condition because "there was no emergency problem with the left ear, such as active bleeding."). I therefore find that Defendants have not met their burden of showing that they are entitled to judgment as a matter of law on the issue of whether Plaintiff suffered from a serious medical condition.

Defendants argue that Plaintiff cannot raise a triable issue of material fact as to deliberate indifference because

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

the issue of "[w]hether or not [P]laintiff needed treatment or to be seen by a physician amounts to nothing more than a disagreement with the course of treatment-not deliberate indifference." (Dkt. No. 92-10 at 20.) As Plaintiff notes (Dkt. No. 109 at 37), none of the named Five Points Defendants has filed an affidavit supporting Defendants' motion for summary judgment. They have therefore not established that their treatment of Plaintiff was based on their medical judgment. The evidence, when viewed in the light most favorable to Plaintiff, indicates that he arrived at Five Points on January 3 complaining of severe pain inflicted through excessive force and that he received absolutely no treatment for his injuries until Nurse Gardner examined him on January 7. Therefore, I find that Plaintiff has raised a triable issue of fact that Defendants Hensel, Goodwin, Kuhlman, and Costello violated his Eighth Amendment right to adequate medical treatment.

**\*31 ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 92) be **_GRANTED IN PART AND DENIED IN PART;_** and it is further

**RECOMMENDED** that the following claims be dismissed pursuant to Defendants' motion for summary judgment: (1) the Eighth Amendment claims against Defendants Weissman and Richards arising from their treatment of Plaintiff's severe body itch, left wrist, and right ankle; (2) the claims against Defendant Ham; (3) the claims against Defendants Brousseau and Donelli for their handling of Plaintiff's grievance regarding Defendant Ham; (4) the retaliation claim against Defendants Nephew, Desotelle, and Snyder based on their filing of misbehavior reports against Plaintiff; (5) the claims against Defendants Brousseau, Donelli, Girdich, and Eagen regarding their handling of Plaintiff's grievances regarding the events of January 2 and 3, 2003; (6) the claim against Defendant LaClair; (7) the claims against Defendant Bullis; and (8) the Eighth Amendment claim against Defendants Weissman and Girdich for approving the imposition of the loaf diet; and it is further

**RECOMMENDED** that the following claims be

dismissed _sua sponte_ pursuant to 28 U.S.C. § 1915(e)(2)(B): (1) Plaintiff's retaliation claim against Defendants Weissman and Richards; and (2) the claim against Defendant Selsky; and it is further

**RECOMMENDED** that the following claims survive summary judgment and _sua sponte_ review and proceed to trial: (1) the conspiracy claim against Defendants Wright, Snyder, and Duprat; (2) the excessive force claim against Defendants Snyder, Duprat, Bogett, and Wright; (3) the retaliation claim against Defendants Snyder, Duprat, Bogett, and Wright arising from the use of excessive force; (4) the retaliation claim against Wright arising from his filing of a misbehavior report against Plaintiff; (5) the failure to intervene claims against Defendants Bezio and Duprat; (6) the retaliation claim against Defendant Bezio; and (7) the Eighth Amendment claims against Defendants Hensel, Goodwin, Kuhlman, and Costello; and it is further

**ORDERED** that the Clerk provide Plaintiff with Form USM 285 for service on Defendant Kuhlman; and it is further

**ORDERED** that the Clerk serve copies of _Miller v. Bailey,_ No. 05-CV-5493, 2008 U.S. Dist. LEXIS 31863, 2008 WL 1787692 (E.D.N.Y. Apr. 17, 2008); _Odom v. Poirier,_ No. 99 Civ. 4933, 2004 U.S. Dist. LEXIS 25059, 2004 WL 2884409 (S.D.N.Y. Dec.10, 2004); _Warren v. Purcell,_ No. 03 Civ. 8736, 2004 U.S. Dist. LEXIS 17792, 2004 WL 1970642 (S.D.N.Y. Sept.3, 2004); _Bond v. Board of Educ. of City of New York,_ 97-cv-1337, 1999 U.S. Dist. LEXIS 3164, 1999 WL 151702 (W.D.N.Y. Mar.17, 1999); _Medina v. Hunt,_ No. 9:05-CV-1460, 2008 U.S. Dist. LEXIS 74205, 2008 WL 4426748 (N.D.N.Y. Sept.25, 2008); _Hill v. City of New York,_ No.03 CV 1283, 2005 U.S. Dist. LEXIS 38926, 2005 WL 3591719 (E.D.N.Y. Dec. 30, 2005); and _Mendez v. Artuz,_ No. 01 CIV. 4157, 2002 U.S. Dist. LEXIS 3263, 2002 WL 313796 (S.D.N.Y. Feb.27, 2002) on Plaintiff in accordance with the Second Circuit's decision in _LeBron v. Sanders,_ 557 F.3d 76 (2d Cir.2009).

**\*32** Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2009.

Benitez v. Ham
Slip Copy, 2009 WL 3486379 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2011 WL 6739517 (N.D.N.Y.)

(Cite as: 2011 WL 6739517 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Sean E. McMAHON, Plaintiff,
v.
Officer FURA, Officer Patti, Officer Summers, City of
Syracuse, Defendants.
No. 5:10–CV–1063 (GHL).

Dec. 23, 2011.

Meggesto, Crossett & Valerino, LLP, James A. Meggesto, Esq., of Counsel, Syracuse, NY, for Plaintiff.

Mary Anne Doherty, Esq., Corporation Counsel for the City of Syracuse, James P. McGinty, Esq., Shannon T. O'Connor, Esq., of Counsel, Syracuse, NY, for Defendants.

***MEMORANDUM DECISION AND ORDER***[FN1]

> **FN1.** This matter is before the Court by consent of both parties. (Dkt. No. 25.)

GEORGE H. LOWE, United States Magistrate Judge.

**\*1** In this action, Plaintiff Sean E. McMahon contends that Defendant City of Syracuse Officers Patti, Fura, and Summers [FN2] arrested him for violating an unconstitutional city ordinance and used excessive force in effectuating that arrest in violation of state and federal law. (Dkt. No. 1.) Currently pending before the Court is Defendants' motion for summary judgment. (Dkt. No. 33.) Plaintiff has opposed the motion. (Dkt.Nos.38–42.) Defendants have filed a reply. (Dkt. No. 45.) For the reasons discussed below, Defendants' motion is granted in part and denied in part.

> **FN2.** Defendant Officers Carns, Cope, Novitsky, and Tassini were dismissed from this action with prejudice with Plaintiff's consent. (Dkt. No. 21 at 2.)

**I. FACTUAL AND PROCEDURAL SUMMARY**

The facts in this case are, unless specifically noted, undisputed.

On June 15, 2009, the Syracuse Police Department assigned four units from the Crime Reduction Team to the evening shift on the west side of the City of Syracuse, specifically the area of Tallman and Rich Streets. (Dkt. No. 33–14 ¶ 1; Dkt. No. 39 ¶ 1.) The Crime Reduction Team is comprised of two-man units assigned to an area of the city where there is a need for increased police presence due to high crime. (Dkt. No. 33–14 ¶ 2; Dkt. No. 39 ¶ 1.) The four Crime Reduction Team units patrolling the west side of the City of Syracuse on June 15, 2009, were unit 524 (Officers Fura and Summers), unit 525 (Officers Patti and Copes), unit 527 (Officers Murphy and Novitsky), and unit 528 (Officers Carns and Tassini). (Dkt. No. 33–14 ¶ 4; Dkt. No. 39 ¶ 1.)

Defendant Officer Patti and Officer Cope responded to a gambling complaint in the area of Onondaga Avenue and Rich Street.[FN3] (Dkt. No. 33–14 ¶ 5; Dkt. No. 39 ¶ 1.) After addressing the gambling complaint, Defendant Patti and Officer Cope sat in their police car and watched a crowd [FN4] of people on the sidewalk of Tallman and Rich Streets. (Dkt. No. 33–14 ¶ 6; Dkt. No. 39 p 2.) Officers Carns and Tassini also responded to the crowd gathered on Tallman Street. (Dkt. No. 33–14 ¶ 7; Dkt. No. 39 ¶ 2.) Defendant Patti observed that a member of the One Ten gang was among the crowd. [FN5] (Dkt. No. 33–14 ¶ 8; Dkt. No. 39 ¶ 2.) Plaintiff was with the group. (Dkt. No. 33–14 ¶ 4; Dkt. No. 39 ¶ 1.)

> **FN3.** Defendants do not assert that this gambling complaint had any connection with Plaintiff or with the group of people with whom he was associating.

> **FN4.** Plaintiff objects to the word "crowd." Plaintiff states that the "term crowd is subjective at best, and in fact, there were only five (5) individuals standing on the sidewalk at the corner

Slip Copy, 2011 WL 6739517 (N.D.N.Y.)

(Cite as: 2011 WL 6739517 (N.D.N.Y.))

of Tallman and Rich Streets ...." (Dkt. No. 39 ¶ 2.)

FN5. Defendants do not assert that Plaintiff is a member of the One Ten gang.

Multiple units of the Crime Reduction Team approached the group gathered on the sidewalk on Tallman Street. (Dkt. No. 33–14 ¶ 9; Dkt. No. 39 ¶ 1.) When the officers approached the group, Plaintiff immediately started to run away. (Dkt. No. 33–14; Dkt. No. 39 ¶ 1.) Officer Cope, Officer Novitsky, and Defendant Patti chased Plaintiff, yelling at him to stop and that he was under arrest. (Dkt. No. 33–14 ¶ 13; Dkt. No. 39 ¶ 1.) Plaintiff ran from police FN6 and the police chasing him on foot were five to six blocks behind. (Dkt. No. 33–14 ¶ 11; Dkt. No. 39 ¶ 3.) Plaintiff did not respond to the verbal commands to stop running. (Dkt. No. 33–14 ¶ 17; Dkt. No. 39 ¶ 1.)

FN6. Plaintiff admits that he "did, in fact, run" but asserts that "the allegation that he ran 'from police' is subjective." (Dkt. No. 39 ¶ 3.)

Defendant Officers Summers and Fura were in their police car when they received a call over the radio about a foot pursuit. (Dkt. No. 33–14 ¶ 14; Dkt. No. 39 ¶ 1.) Defendants Summers and Fura saw a person running across Onondaga Street with police officers chasing behind him. (Dkt. No. 33–14 ¶ 15; Dkt. No. 39 ¶ 1.) Defendants Summers and Fura responded to the call. (Dkt. No. 33–14 ¶ 16; Dkt. No. 39 ¶ 1.)

**\*2** Plaintiff was running across the street with the officers chasing behind him when Defendants Summers and Fura turned their police car down Onondaga Street. (Dkt. No. 33–14 ¶ 18; Dkt. No. 39 ¶ 1.) Defendant Fura gave Plaintiff verbal commands to stop running from the police car. FN7 (Dkt. No. 33–14 ¶ 19.) On Fitch Street, Defendant Fura attempted to pull the police car onto the sidewalk to block Plaintiff's path and make him stop, however Plaintiff ran around the car and continued to run. FN8 (Dkt. No. 33–4 ¶ 20.)

FN7. Plaintiff denies this fact, citing to his deposition transcript. (Dkt. No. 39 ¶ 4.) The

cited portion of the deposition transcript states: "Q: ... You said you don't have a clear recollection of what happened when ... the police came in contact with you; is that a fair statement? A: Yes." (Dkt. No. 33–9 at 15:20–24.)

FN8. See note seven.

Defendants Fura and Summers exited their car and were able to catch Plaintiff. (Dkt. No. 33–14 ¶ 21; Dkt. No. 39 ¶ 1.) At his deposition, Defendant Fura testified that when he caught up with Plaintiff:

A: I grabbed the back of his shirt and attempted to pull him back. He pulled forward, at which time I delivered a strike to his right jaw area, and we both ended up falling to the ground, forward.

Q: And did you say anything to him?

A: I told him to put his hands behind his back. He was under arrest.

Q: What was he under arrest for, if you know?

A: At this time he was going to be under arrest for disorderly crowd.

Q: But you didn't know that at the time?

A: I didn't know specifically what the charge was.

Q: You told him he was under arrest, but you didn't know for what violation? Is that your testimony?

A: Correct.

   (Dkt. No. 33–12 at 6:8–24.)

   At his deposition, Defendant Summers testified that:

A: Officer Fura grabbed a hold of—got close to Mr. McMahon and grabbed a hold of him, and he pulled, and when he did, from what I can tell, I seen Mr. McMahon spin around and then go to the ground.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 6739517 (N.D.N.Y.)

(Cite as: 2011 WL 6739517 (N.D.N.Y.))

Q: You say you saw Officer Fura grab Mr. McMahon?

A: Well, his shirt. Clothing. Something of that nature. Because he pulled, and then he spun around. Like, he slipped out of his grasp or slips out of—but I just seen him spin around.

Q: Did he get grabbed from the front or from behind or from the side?

A: As I'm coming around the car—I coul[d]n't tell you. I know he was running. We were behind him, so it was either from the side, backside or something, because when he did, he went around like that, and he rolled into the—so I'd say it would have to be from the backside area.

Q: And Mr. McMahon ended up on the ground?

A: That's correct, sir.

Q: What action did you take then?

A: At that time I came around, and Officer Fura was trying to grab a hold of him. Mr. McMahon was pushing to get off the ground to get free again. He was advised to stop resisting and get on the ground and place his hands behind his back, at which time he didn't comply with that at all. I placed a strike to the shoulder blade to collapse the shoulder down to get on the ground so I can handcuff him. He continued to push off. I applied another strike. The strike hit the top of the shoulder, bounced off and cut his eyebrow.

Q: What happened next?

**\*3** A: At that point in time we were finally able to get him down on the ground and forcefully put his hands behind his back and get him cuffed, and that's when I noticed the weed in his hand, as I pulled his hand behind his back. I had to forcibly remove the marijuana from his hand.

Q: That was after he was handcuffed?

A: That was while he was handcuffed. Yes, sir.

(Dkt. No. 33–10 at 9:15–11:5.)

The unverified complaint, signed only by counsel, alleges that:

Defendant Fura punched Plaintiff in the face with his right fist causing the Plaintiff to fall to his stomach. Due to the strike, Plaintiff fell and hit his head on the pavement and sustained numerous injuries on his face and hands. While still lying face [ ] down, Plaintiff tried to move, and Officer Summers struck him near his left eyebrow again causing Plaintiff to sustain injuries. Defendants claimed Plaintiff was trying to resist and therefore ... Defendant Fura and Defendant Summers punched Plaintiff again in his face and body. They then forcefully placed Plaintiff's arms behind his back and handcuffed him.

(Dkt. No. 1 ¶¶ 8–10.)

Despite the allegations in the unverified complaint, the evidence developed during discovery shows that Plaintiff does not recall the actual stop by police. (Dkt. No. 33–14 ¶ 22; Dkt. No. 39 ¶ 1.) Plaintiff remembers running from police and the sound of sirens behind him. (Dkt. No. 33–14 ¶ 23; Dkt. No. 39 ¶ 1.) At his deposition, Plaintiff testified that "the one officer in the car, he tried to cut me off as I'm running, and I believe he was trying to run me over ... All four of the wheels busted or sounded like four of the wheels busted, and then ... that's when I believe I was tased." (Dkt. No. 33–9 at 14:3–9.) At his 50–h hearing, Plaintiff testified "I just remember it felt like I was being electrocuted ... So I must have been tased by ... an officer ." (Dkt. No. 33–8 at 23:23–24:18.) At his deposition, Plaintiff testified that he believed he had been tased because his "whole body shut down," but that he does not remember when that happened. (Dkt. No. 33–9 at 17:9–15.) Plaintiff remembers hitting the ground but does not remember what happened to make him fall. (Dkt. No. 33–9 at 15:5–15.) That is all that Plaintiff recalls before waking up in the hospital. (Dkt. No. 33–14 ¶ 24; Dkt. No. 39 ¶ 1.) Plaintiff does not recall the contact that he had with police once they were able to catch up with him. (Dkt. No. 33–14 ¶ 25; Dkt. No. 39 ¶ 1.)

Slip Copy, 2011 WL 6739517 (N.D.N.Y.)

(Cite as: 2011 WL 6739517 (N.D.N.Y.))

Neither Defendant Summers nor Defendant Fura was armed with a taser on June 15, 2009.[FN9] (Dkt. No. 33–14 ¶ 28; Dkt. No. 33–12 at 7:4–6.) Defendant Patti was armed with a taser, but testified at his deposition that he did not use it. (Dkt. No. 33–11 at 21:3–22:1 .) Defendant Fura arrested Plaintiff.[FN10] (Dkt. No. 33–14 ¶ 29.) Defendant Patti did not arrest Plaintiff.[FN11] (Dkt. No. 33–14 ¶ 30.)

    FN9. See note seven.

    FN10. See note seven.

    FN11. See note seven.

Rural Metro took Plaintiff to the hospital. (Dkt. No. 33–14 ¶ 27; Dkt. No 39 ¶ 1.) Plaintiff was released from the hospital at about 2:00 a.m. (Dkt. No. 33–8 at 27:19–21.) He got a ride home from a friend. *Id.* at 27:24–25. Plaintiff was never lodged in the Justice Center. *Id.* at 28:1–3.

    **\*4** Plaintiff was issued appearance tickets for unlawful possession of marijuana, resisting arrest, and for violating the City of Syracuse's disorderly crowds ordinance.[FN12] (Dkt. No. 33–14 ¶ 31.)

    FN12. Plaintiff admits that he was issued appearance tickets, but notes that he was charged with marijuana possession five minutes after being charged with the other two offenses. (Dkt. No. 39 ¶ 6 .)

The unverified complaint, signed only by counsel, alleges that "[t]he Honorable Vanessa Brogan dismissed all criminal charges against the plaintiff." (Dkt. No. 1 ¶ 17.) There is no evidence in the record before the Court either confirming or casting doubt on that assertion.

Plaintiff filed a notice of claim with the City of Syracuse on September 1, 2009. (Dkt. No. 33–5.) Plaintiff listed the nature of his claim as "[f]alse arrest, false imprisonment, excessive force, police brutality, violation of claimant's civil rights, and assault." *Id.*

Plaintiff filed his complaint in this Court on September 2, 2010. (Dkt. No. 1.) The complaint asserts the following causes of action: (1) a 42 U.S.C. § 1983 false arrest claim against Defendants Fura, Patti, and Summers; (2) a 42 U.S.C. § 1983 excessive force claim against Defendants Fura, Patti, and Summers; (3) a state law false imprisonment claim against Defendants Fura, Patti, and Summers; (4) a state law assault claim against Defendants Fura and Summers; (5) a state law negligence claim against Defendants Fura, Patti, and Summers; (6) a claim against the City of Syracuse regarding the constitutionality of Syracuse City Ordinance 16–2; (7) a *Monell* claim against the City of Syracuse regarding the hiring, supervising, and training of officers; and (8) a state law respondeat superior claim against the City of Syracuse. (Dkt. No. 1 ¶¶ 14, 18–37.) Plaintiff requests compensatory damages, punitive damages, attorney fees, costs, and "such other and further relief as may be just and proper under the circumstances, including but not limited to appropriate injunctive relief." *Id.* at 6.

Defendants moved to dismiss the complaint. (Dkt. No. 19.) Defendants argued that the complaint did not comply with Federal Rule of Civil Procedure 8(a)(2) because it set forth only conclusory allegations, that several officers should be dismissed because the complaint did not indicate that they were personally involved in the incident, and that any claims against the officers in their official capacities should be dismissed. *Id.* The Court denied Defendants' motion to dismiss on May 17, 2011, but dismissed the claims against Officers Carns, Cope, Novitsky, and Tassini with Plaintiff's consent. (Dkt. No. 21.)

Defendants now move for summary judgment. (Dkt. No. 33.) Plaintiff has opposed the motion. (Dkt.Nos.38–42.) Defendants have filed a reply. (Dkt. No. 45.)

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 6739517 (N.D.N.Y.)

(Cite as: 2011 WL 6739517 (N.D.N.Y.))

56(a). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin,* 467 F.3d at 272–73. The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether a genuine issue of material [FN13] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 309 (2d Cir.2008).

> FN13. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson,* 477 U.S. at 248.

**B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim**

**\*5** To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnise Gen. Transatlantique,* 405 F.2d 270, 273 (2d Cir.1968) (citations omitted); *accord, Katz v. Molic,* 128 F.R.D. 35, 37–38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Accordingly, it is appropriate to summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 1950 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

**III. ANALYSIS**

**A. Constitutionality of City Ordinance § 16–2**

Plaintiff was initially placed under arrest for violating Syracuse City Ordinance § 16–2, Disorderly Crowds. (Dkt. No. 33–12 at 6:8–24.) That ordinance states that "[p]ersons shall not collect in bodies or crowds in the streets or on the sidewalks for an unlawful purpose, or for any purpose to the annoyance or disturbance of citizens." The complaint alleges that the ordinance is unconstitutionally vague and unenforceable.[FN14] (Dkt. No.

Slip Copy, 2011 WL 6739517 (N.D.N.Y.)

(Cite as: 2011 WL 6739517 (N.D.N.Y.))

1 ¶ 30.) Defendants' moving papers do not address this claim. (Dkt. No. 33–15.) Plaintiff's opposition papers focus largely on the issue. (Dkt. No. 42 at 3–5.) Defendants' reply papers address Plaintiff's arguments. (Dkt. No. 45–1 at 5–7.)

> FN14. The complaint does not allege that the ordinance is overbroad.

**\*6** Plaintiff argues that § 16–2 is unconstitutionally vague under *Coates v. City of Cincinnati,* 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971). (Dkt. No. 42 at 4–5.) In *Coates,* the Supreme Court examined a loitering ordinance that made it a criminal offense for "three or more persons to assemble on any of the sidewalks and there conduct themselves in a manner annoying to persons passing by." *Coates,* 402 U.S. at 611 (punctuation omitted). Three individuals convicted under the ordinance appealed to the Supreme Court, arguing that the ordinance was facially unconstitutional. *Id.* at 612. The Court agreed, finding the ordinance both unconstitutionally vague and unconstitutionally overbroad. The Court stated that the "ordinance is unconstitutionally vague because it subjects the exercise of the right of assembly to an unas[c]ertainable standard, and unconstitutionally broad because it authorizes the punishment of constitutionally protected conduct." *Id.* at 614. Regarding vagueness, the Court explained that:

> Conduct that annoys some people does not annoy others. Thus, the ordinance is vague, not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all. As a result, men of common intelligence must necessarily guess at its meaning.

> It is said that the ordinance ... encompass[es] many types of conduct clearly within the city's constitutional power to prohibit. And so, indeed, it is. The city is free to prevent people from blocking sidewalks, obstructing traffic, littering streets, committing assaults, or engaging in countless other forms of antisocial conduct. It can do so through the enactment and enforcement of ordinances directed with reasonable specificity toward the conduct to be prohibited. *It cannot constitutionally do so*

> *through the enactment and enforcement of an ordinance whose violation may entirely depend upon whether or not a policeman is annoyed.*

> *Id.* at 614 (citations omitted) (emphasis added).

The Court also found that the statute was unconstitutional because it violated the constitutional right of free assembly and association. *Id.* at 615. The Court stated that:

> The First and Fourteenth Amendments do not permit a State to make criminal the exercise of the right of assembly simply because its exercise may be 'annoying' to some people If this were not the rule, the right of the people to gather in public places for social or political purposes would be continually subject to summary suspension through the good-faith enforcement of a prohibition against annoying conduct. And such a prohibition, in addition, contains an obvious invitation to discriminatory enforcement against those whose association together is 'annoying' because their ideas, their lifestyle, or their physical appearance is resented by the majority of their fellow citizens.

> *Id.* at 615–616.

**\*7** Plaintiff argues that § 16–2 "is nearly identical to the ordinance that was declared unconstitutional in *Coates* ... The wording regarding the annoyance is similar and should be declared unconstitutional for the same reasons set forth and relied upon in *Coates."* (Dkt. No. 42 at 4–5.)

In their reply papers, Defendants argue that

> Plaintiff's reliance on *Coates* is misplaced. In *Coates,* the appellants had their convictions for violating an ordinance affirmed by the Supreme Court of Ohio. On appeal to the United States Supreme Court the issue before the court was whether the Cincinnati ordinance was constitutional on its face. Plaintiff argues that the Court in *Coates* held "that this ordinance was vague because conduct, which annoys some people, does not annoy others and therefore men of common intelligence would have to guess at the meaning of the ordinance." However, the holding in *Coates* was much narrower.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

The Court held that the ordinance was "unconstitutionally vague because it subjects the exercise of the right of assembly to an unascertainable standard, and unconstitutionally broad because it authorizes the punishment of constitutionally protected conduct." Here, Plaintiff is not seeking to overturn a conviction where he was exercising his First Amendment right to association or assembly.

More importantly, Section 16–2 of the Revised General Ordinances, General Prohibitions against disturbance of the public peace and quiet, explicitly states "persons shall not collect in bodies or crowds in the streets or on the sidewalks for any unlawful purpose, or for any purpose to the annoyance or disturbance of citizens." The use of the phrase "unlawful purpose" in the city of Syracuse's ordinance could easily fall under "antisocial conduct," which as the Court in *Coates* explicitly stated, "The city is free to prevent people from blocking sidewalks, obstructing traffic, littering streets, committing assaults, or engaging in other forms of antisocial conduct."

As such, Plaintiff's cases are not applicable to the present litigation. Plaintiff attempts to use cases centered on criminal conviction appeals to support his claims for civil liability on an unchallenged ordinance at the time of his arrest. Moreover, there is no evidence in the record that this ordinance was ever declared unconstitutional before Plaintiff's arrest.

(Dkt. No. 45–1 at 6–7.)

Defendants thus appear to argue that Plaintiff does not have standing to challenge the constitutionality of § 16–2 because he was not convicted of violating the ordinance. Defendants' argument is without merit. *See Naprstek v. City of Norwich,* 545 F.2d 815, 817 (2d Cir.1976) (minors and their parents had standing to challenge constitutionality of curfew ordinance which had been applied to and enforced against person under circumstances identical to those in which the plaintiffs found themselves at the time of bringing the action, even though none of the plaintiffs had been arrested or fined or threatened with arrest or a fine); *Chapin v. Town of Southampton,* 457 F.Supp. 1170, 1172 (E.D.N.Y.1978)

(individual who had been arrested for nude sunbathing in violation of local ordinance had standing to challenge constitutionality of ordinance, even though charges had been dismissed). Here, Plaintiff was arrested for violating the ordinance. There is no indication in the record before the Court that the City of Syracuse intends to stop enforcing the ordinance. Therefore, Plaintiff has standing to challenge the ordinance.

**\*8** Defendants argue that § 16–2 is distinguishable from the ordinance discussed in *Coates* because it prohibits loitering for "an unlawful purpose." Section 16–2 would likely not be constitutionally infirm if it simply read "[p]ersons shall not collect in bodies or crowds in the streets or on the sidewalks for any unlawful purpose." However, the ordinance does not end there. It continues: *"or* for any purpose to the annoyance or disturbance of citizens." Thus, an individual may violate § 16–2 if he or she is perceived to have an annoying or disturbing purpose, even if everyone involved concedes that the purpose is lawful. The ordinance does not define what the terms "annoying" or "disturbing" mean. As the Supreme Court noted in *Coates,* what is unremarkable to one person may be annoying or disturbing to another. This is precisely the type of vagueness that the Supreme Court rejected as unconstitutional in *Coates.* Vague ordinances are subject to arbitrary and possibly discriminatory enforcement.

For these reasons, Defendants are not entitled to summary judgment of this claim. Plaintiff has not requested summary judgment on this claim. Therefore, the claim will proceed forward, possibly to be resolved through pretrial motions. The Court will conduct a telephone conference as soon as possible to discuss this issue and to schedule a trial date.

**B. 42 U.S.C. § 1983 Excessive Force Claim**

1. *Merits*

Plaintiff claims that Defendants Fura, Summers, and Patti violated his civil rights by subjecting him to excessive force.[FN15] (Dkt. No. 1 ¶¶ 14(c), 18–19.) Defendants move for summary judgment of this claim,[FN16] arguing that the force they used was objectively

Slip Copy, 2011 WL 6739517 (N.D.N.Y.)

(Cite as: 2011 WL 6739517 (N.D.N.Y.))

reasonable under the circumstances. (Dkt. No. 33–15 at 11–12.) Plaintiff argues that (1) no force was reasonable under the circumstances because the officers arrested him for violating an unconstitutional ordinance; or (2) summary judgment is not appropriate because reasonableness is a question of fact. (Dkt. No. 42 at 8.)

> FN15. The complaint does not use the phrase "excessive force," but asserts that the individual defendants violated Plaintiff's "rights under the Fourth and Fourteenth Amendments ... to be free from an unreasonable search and seizure of his person [resulting in] physical injuries to his person." (Dkt. No. 1 ¶ 14.) The Court has construed this as an excessive force claim.

> FN16. Defendants address the merits of the excessive force claim despite stating that "the complaint does not reveal a cause of action for excessive force." (Dkt. No. 33–15 at 11.)

a. *Legal Standard*

"The Fourth Amendment protects individuals from the government's use of excessive force while detaining or arresting individuals." *Jones v. Parmley,* 465 F.3d 46, 61 (2d Cir.2006) (citing *Thomas v. Roach,* 165 F.3d 137, 143 (2d Cir.1999)). "When determining whether police officers have employed excessive force in the arrest context, the Supreme Court has instructed that courts should examine whether the use of force is objectively reasonable 'in light of the facts and circumstances confronting them, without regard to the officers' underlying intent or motivation.' " *Jones,* 465 F.3d at 61 (quoting *Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)) (punctuation omitted). Among the most relevant facts and circumstances are (1) the severity of the crime allegedly committed; (2) the threat of danger to the officer and society; and (3) whether the suspect was resisting or attempting to evade arrest. *Thomas,* 165 F.3d at 143. Reasonableness is generally a question of fact. *See McKelvie v. Cooper,* 190 F.3d 58 (2d Cir.1999) (reversing magistrate judge's grant of summary judgment to officers of Fourth Amendment excessive force claim).

b. *Defendant Fura*

**\*9** In analyzing Plaintiff's excessive force claims, the Court is faced with a curious record because Plaintiff has no memory of his encounter with the police. Despite this oddity, the undisputed evidence shows that when Defendant Fura used force on Plaintiff, Plaintiff was suspected only of violating § 16–2. There is no evidence in the record that Defendant Fura believed that Plaintiff was armed or was otherwise a threat of danger to the officers or society. On the other hand, it is undisputed that Plaintiff ran away and did not stop when officers shouted at him. By his own testimony, Defendant Fura responded to Plaintiff's non-violent offense, lack of threat to the officers or society, and flight by grabbing Plaintiff and punching him in the jaw. (Dkt. No. 33–12 at 6:8–24.) A reasonable juror could find that Defendant Fura's actions were reasonable in light of Plaintiff's flight. Another reasonable juror could find that Defendant Fura's reaction was not reasonable in light of the minimal offense that Plaintiff had allegedly committed and the fact that Plaintiff was unarmed and had not threatened to hurt the officers or any other individuals. Thus, a question of triable fact exists as to whether Defendant Fura used excessive force.

c. *Defendant Summers*

Defendant Summers testified that when he arrived on the scene, Plaintiff was on the ground resisting Defendant Fura. (Dkt. No. 33–10 at 10:11–16.) When Plaintiff disregarded a verbal order to place his hands behind his back, Defendant Summers struck Plaintiff's shoulders twice, with one blow bouncing off of Plaintiff's shoulder and cutting his eyebrow. *Id.* at 10:16–21. As noted above, this is the only evidence in the record regarding the encounter between Defendant Summers and Plaintiff because Plaintiff does not remember the incident. A reasonable juror could not conclude that Defendant Summers acted unreasonably. Therefore, the excessive force claim against Defendant Summers is dismissed.

d. *Defendant Patti*

The complaint does not allege that Defendant Patti used any force against Plaintiff. (Dkt. No. 1.) Plaintiff's opposition papers do not discuss any use of force by Defendant Patti. (Dkt. No. 42.) Defendants assert that Defendant Patti "was not in any manner involved in the circumstances involved with Plaintiff's arrest." (Dkt. No.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 6739517 (N.D.N.Y.)

(Cite as: 2011 WL 6739517 (N.D.N.Y.))

33–15 at 1.) The evidence before the Court shows that Defendant Patti, among others, chased Plaintiff, yelling at him to stop and that he was under arrest. (Dkt. No. 33–14 ¶ 13; Dkt. No. 39 ¶ 1.) Plaintiff testified at his 50–h hearing that "it felt like I was being electrocuted ... So I must have been tased by ... an officer" and at his deposition that he believed he had been tased because his whole body shut down, but that he does not remember when that happened. (Dkt. No. 33–8 at 23:23–24:18; Dkt. No. 33–9 at 17:9–15.) Defendant Patti testified at his deposition that he was armed with a taser but that he did not use it. (Dkt. No. 33–11 at 21:3–22:1.)

**\*10** This evidence is insufficient to raise a triable issue of fact that Defendant Patti used any force against Plaintiff because it is entirely dependent on Plaintiff's own extremely incomplete testimony. In general, of course, "[c]redibility determinations ... are jury functions, not those of a judge." _Anderson,_ 477 U.S. at 255. _See also Rule v. Brine, Inc.,_ 85 F.3d 1002, 1011 (2d Cir.1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."). There is, however, a "narrow exception" to the general rule that credibility determinations are not to be made on summary judgment. _Jeffreys v. City of New York,_ 426 F.3d 549, 554 (2d Cir.2005); _Blake v. Race,_ 487 F.Supp.2d 187, 202 (E.D.N.Y.2007). In _Jeffreys,_ the Second Circuit held that in the "rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete," the court may appropriately conclude at the summary judgment stage that no reasonable jury would credit the plaintiff's testimony. _Jeffreys,_ 426 F.3d at 554.

In _Jeffreys,_ the plaintiff, who alleged that police officers beat him and threw him out a window, confessed on at least three occasions that he had jumped out of a third-story window rather than having been thrown. _Id._ at 552. The plaintiff did not publicly state that he had been thrown out of a window by police officers until _nine months_ after the incident. _Id._ The plaintiff could not identify any of the individuals whom he alleged participated in the attack or describe their ethnicities, physical features, facial hair, weight, or clothing on the night in question. _Id._

The _Jeffreys_ exception is most applicable where the plaintiff's version of events is contradicted by defense testimony. In _Jeffreys,_ for instance, one of the arresting officers declared that, contrary to the plaintiff's version of events, he was the only officer who entered the room where the plaintiff was allegedly beaten and that he saw the plaintiff jump out the open window. _Jeffreys,_ 426 F.3d at 551–52.

Here, Plaintiff testified that he "must have" been tased by "an officer." This incomplete testimony is contradicted by testimony by Defendant Patti, the only defendant who was armed with a taser, that he did not use his taser. No reasonable juror could credit a claim that Defendant Patti used force on Plaintiff. Indeed, as noted above, it is not even clear that Plaintiff _alleges_ that Defendant Patti used force. Therefore, the excessive force claim against Defendant Patti is dismissed.

2. _Qualified Immunity_

Defendants argue that even if the court finds that Defendant Fura used excessive force, he is entitled to qualified immunity. (Dkt. No. 33–15 at 12.)

The qualified immunity inquiry generally involves two issues: (1) "whether the facts, viewed in the light most favorable to the plaintiff, establish a constitutional violation"; and (2) "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted." _Sira v. Morton,_ 380 F.3d 57, 68–69 (2d Cir.2004) (citations omitted), _accord, Higazy v. Templeton,_ 505 F.3d 161, 169, n. 8 (2d Cir.2007) (citations omitted).

**\*11** In determining the second issue (i.e., whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted), courts in the Second Circuit consider three factors: (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful. _Jermosen v. Smith,_ 945 F.2d 547, 550 (2d Cir.1991) (citations omitted), _cert. denied,_ 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 6739517 (N.D.N.Y.)

(Cite as: 2011 WL 6739517 (N.D.N.Y.))

(1992).

In the excessive force context "the question for the purposes of qualified immunity is whether a reasonable officer could have believed that the use of force was objectively reasonable in light of the circumstances." *Lennon v. Miller,* 66 F.3d 416, 425 (2d Cir.1995). In excessive force cases, then, the analysis "converge[s] on one question: Whether in the particular circumstances faced by the officer, a reasonable officer would believe that the force employed would be lawful." *Cowan v. Breen,* 352 F.3d 756, 764 n. 7 (2d Cir.2003) (citation omitted).

If the facts showed that Defendant Fura merely grabbed Plaintiff to stop him from running, or even that he pushed Plaintiff to stop his flight, the Court would have no difficulty concluding that Defendant Fura was entitled to qualified immunity. However, the Court is unable to conclude as a matter of law that a reasonable officer would believe that punching a fleeing, non-violent suspect in the jaw would be lawful. Therefore, the excessive force claim against Defendant Fura will proceed to trial.

**C. False Arrest Claim**

Plaintiff alleges that Defendants Summers, Fura, and Patti violated his Fourth Amendment rights by subjecting him to "an unreasonable search and seizure of his person" and the "loss of his physical liberty." (Dkt. No. 1 ¶ 14.) Defendants move for summary judgment of this claim. (Dkt. No. 33–15 at 9–10.)

The elements of a Fourth Amendment false arrest claim under 42 U.S.C. § 1983 are the same as those for a false arrest claim under New York law. *Kraft v. City of New York,* 696 F.Supp.2d 403, (S.D.N.Y.2010). "To state a claim for false arrest under New York law, a plaintiff must show that (1) the defendant intended to confine the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged." *Savino v. City of New York,* 331 F.3d 63, 75 (2d Cir.2003) (punctuation and citation omitted). Where an officer has probable cause to arrest a plaintiff, the confinement is privileged. *Id.* at 76. The burden of showing that there was probable cause for the arrest is on the officer. *Id.*

Defendants argue that Plaintiff cannot establish that he was falsely arrested because he was not aware of his confinement. (Dkt. No. 33–15 at 9–10.) Plaintiff's opposition papers do not address this argument.[FN17] (Dkt. No. 42.) It is undisputed that Plaintiff lost consciousness before Defendant Fura arrested him and did not regain consciousness until he was in the hospital. (Dkt. No. 33–14 ¶ 24; Dkt. No. 39 ¶ 1.) Thus, Plaintiff was not conscious of the confinement. Therefore, Defendants' motion for summary judgment dismissing this claim is granted.

> **FN17.** Regarding the false arrest claim, Plaintiff argues that Defendants did not have probable cause to arrest him because § 16–2 is unconstitutionally vague. (Dkt. No. 42 at 6.) Plaintiff's argument is without merit. *See Michigan v. DeFillippo,* 443 U.S. 31, 37, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979) ("Police are charged to enforce laws until and unless they are declared unconstitutional ... Society would be ill-served if police officers took it upon themselves to determine which laws are and which are not constitutionally entitled to enforcement.").

**D. City of Syracuse's Liability for Excessive Force and False Arrest**

\*12 Plaintiff claims that the City of Syracuse is liable for any constitutional torts committed by the individual Defendants because it failed to exercise reasonable care in hiring its officers, inadequately supervised its officers, and inadequately trained its officers. (Dkt. No. 1 ¶¶ 32–34.) Defendants move for summary judgment of this claim. (Dkt. No. 33–15 at 14–16.) As Defendants correctly note (Dkt. No. 45–1 at 2), Plaintiff's opposition (Dkt. No. 42) does not address this argument.

In order "to hold a [municipality] liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to ... prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir.1983). An "official policy or custom" can be shown in several ways: (1) a formal policy officially endorsed by the municipality;

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 6739517 (N.D.N.Y.)

(Cite as: 2011 WL 6739517 (N.D.N.Y.))

(2) actions taken by government officials responsible for establishing municipal policies related to the particular deprivation in question; (3) a practice so consistent and widespread that it constitutes a custom or usage sufficient to impute constructive knowledge of the practice to policymaking officials; and (4) a failure by policymakers to train or supervise subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come in contact with the municipal employees. *Dorsett–Felicelli v. C'nty of Clinton,* 371 F.Supp.2d 183, 194 (N.D.N.Y.2005) (citing *Monell,* 436 U.S at 690, *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483–84, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), and *City of Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)).

The record does not disclose any evidence that any official policy or custom of the City of Syracuse led to any deprivation of Plaintiff's constitutional rights. Therefore, Defendants' motion for summary judgment dismissing this claim is granted.

**E. State Law Claims**

1. *Negligence*

Plaintiff alleges that Defendants Patti, Fura, and Summers were negligent. (Dkt. No. 1 ¶¶ 25–27.) Defendants move for summary judgment of this claim, arguing that it is barred because Plaintiff did not mention negligence in the Notice of Claim he filed with the City of Syracuse. (Dkt. No. 33–15 at 13.) As Defendants correctly note (Dkt. No. 45–1 at 2), Plaintiff's opposition (Dkt. No. 42) does not address this argument.

New York General Municipal Law Section 50–e requires plaintiffs to submit a notice of claim to a municipality prior to bringing suit in court. The purpose of the claim requirement is to allow the defendant municipality to conduct a proper investigation and assess the merits of the claim. *Carhart v. Village of Hamilton,* 190 A.D.2d 973, 594 N.Y.S.2d 358 (3d Dept.1993). A theory of liability not mentioned in the notice of claim cannot be asserted later in litigation. *Olivera v. City of New York,* 270 A.D.2d 5, 704 N.Y.S.2d 42 (1st Dept.2000). Here, Plaintiff's notice of claim to the City of Syracuse mentions "[f]alse arrest, false imprisonment,

excessive force, police brutality, violation of claimant's civil rights, and assault." (Dkt. No. 33–5.) It does not mention negligence. Therefore, Defendants' motion for summary judgment dismissing Plaintiff's negligence claim is granted.

2. *False Imprisonment*

**\*13** Plaintiff alleges that Defendants Patti, Fura, and Summers falsely imprisoned him. (Dkt. No. 1 ¶¶ 20–22.) For the same reasons discussed above regarding Plaintiff's constitutional false arrest claim, Defendants' motion for summary judgment dismissing this claim is granted.

3. *Assault*

Plaintiff alleges that Defendants Fura and Summers assaulted him. (Dkt. No. 1 ¶¶ 23–24.) Defendants move for summary judgment dismissing this claim, arguing that the officers used only necessary force and that, even if they used unreasonable force, they are entitled to qualified immunity. (Dkt. No. 33–15 at 11–12.)

"[T]he test for whether a plaintiff can maintain ... a cause of action against law enforcement officials [for assault and battery] is whether the force used was 'reasonable,' the exact same test as the one used to analyze a Fourth Amendment excessive force claim." *Hogan v. Franco,* 896 F.Supp. 1313, 1315 n. 2 (N.D.N.Y.1995). Here, as discussed above, there is a triable issue of fact as to whether Defendant Fura used reasonable force but the undisputed facts show that Defendant Summers used reasonable force. Thus, the undisputed facts raise a triable issue of fact that Defendant Fura assaulted Plaintiff. Additionally, for the reasons discussed above regarding Plaintiff's constitutional excessive force claim, the Court cannot find as a matter of law at this time that Defendant Fura is entitled to qualified immunity. *Jones,* 465 F.3d at 63. Therefore, Defendants' motion for summary judgment of Plaintiff's state law claim for assault is granted as to Defendant Summers but denied as to Defendant Fura.

4. *Respondeat Superior*

Plaintiff claims that the City of Syracuse is liable under the theory of *respondeat superior* for Defendant Fura's alleged assault of Plaintiff. (Dkt. No. 1 ¶¶ 36–37.)

Slip Copy, 2011 WL 6739517 (N.D.N.Y.)

(Cite as: 2011 WL 6739517 (N.D.N.Y.))

Defendants do not address this claim in their motion for summary judgment, presumably relying on their substantive arguments regarding the individual Defendants to relieve the City of liability. Cities may be held vicariously liable for state law torts committed by police officers under a theory of *respondeat superior. See Williams v. City of White Plains,* 718 F.Supp.2d 374, 381 (S.D.N.Y.2010). Therefore, the *respondeat superior* claim against the City of Syracuse regarding Defendant Fura's alleged assault of Plaintiff will proceed to trial.

**ACCORDINGLY,** it is hereby

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 33) is ***GRANTED IN PART AND DENIED IN PART.*** The motion is granted as to all causes of action *except* (1) the claim against the City of Syracuse regarding the constitutionality of Ordinance § 16–2; (2) the excessive force claim against Defendant Fura; (3) the assault claim against Defendant Fura; and (4) the *respondeat superior* claim against the City of Syracuse regarding Defendant Fura's use of force. Those claims will proceed to trial; and it is further

**\*14 ORDERED** that a telephone conference be scheduled at the earliest possible convenience of the Court and the parties to schedule a trial date.

N.D.N.Y.,2011.

McMahon v. Fura
Slip Copy, 2011 WL 6739517 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.